**EXHIBIT 1**

*22-000084160*

CHIEF FINANCIAL OFFICER
JIMMY PATRONIS
STATE OF FLORIDA

DC CAPITAL LAW FIRM, LLP

PLAINTIFF(S)

VS.

THE HANOVER INSURANCE COMPANY

DEFENDANT(S)

_____/

SUMMONS, COMPLAINT, CIVIL COVER SHEET

| | |
|---|---|
| **CASE #:** | **50-2022-CA-002224** |
| **COURT:** | **15TH JUDICIAL CIRCUIT** |
| **COUNTY:** | **PALM BEACH** |
| **DFS-SOP #:** | **22-000084160** |

# <u>NOTICE OF SERVICE OF PROCESS</u>

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the State of Florida. Said  process was received in my office by ELECTRONIC DELIVERY on Thursday, March 10, 2022 and a copy was forwarded by ELECTRONIC DELIVERY on Monday, March 14, 2022 to the designated agent for the named entity as shown below.


HANOVER INSURANCE COMPANY (THE)

CHARLES F CRONIN

440 LINCOLN ST
WORCESTER, MA 01653


**\*Our office will only serve the initial process(Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule  #1.080**


Jimmy Patronis
Chief Financial Officer


ROBERT HUBBARD
ATTORNEY
VAKA LAW GROUP
777 S. HARBOUR ISLAND BLVD., SUITE 300
TAMPA, FL 33547

TG1

Filing # 145426201 E-Filed 03/10/2022 08:34:34 AM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION

DC CAPITAL LAW FIRM, LLP,
    Plaintiff,

vs.                                   CASE No. _____

THE HANOVER INSURANCE COMPANY
    Defendant.
_____/

## SUMMONS

THE STATE OF FLORIDA:
TO EACH SHERIFFS OF SAID STATE:

      **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or Petition in the above styled cause upon the Defendant:

**THE HANOVER INSURANCE COMPANY**
CHIEF FINANCIAL OFFICER
200 E. GAINES ST.
TALLAHASSEE, FL 32399

      Each Defendant is hereby required to serve written defenses to said Complaint or Petition on Plaintiff's attorney, whose name and address is:

**VAKA LAW GROUP, P.L.**
**Robert C. Hubbard, Esquire**
Florida Bar No. 098996
777 S. Harbour Island Blvd., Suite 300
Tampa, Florida 33602-5853
Phone: (813) 549-1799
Fax:   (813) 549-1790

within twenty (20) days after service of this Summons upon that Defendant, exclusive of the day or service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

**DATED** _____ Mar 10 2022 _____.

Clerk of Said Court:

*Janis Sustache*
_____
By: As Deputy Clerk
(Court Seal)    Janis Sustache

1

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court and also, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

**If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.**

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica.

**Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).**

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

**Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.**

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____/

## STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021 (DCMSO)

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

        3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**.   ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

        **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

**Administrative Circuit Judge**

Case 9:22-cv-80512-AHS   Document 1-2   Entered on FLSD Docket 03/30/2022   Page 7 of 109

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION

DC CAPITAL LAW FIRM, LLP,

     Plaintiff,

v.                                                        Case No.:

THE HANOVER INSURANCE COMPANY,

     Defendant.

_____/

## **COMPLAINT**

Plaintiff, DC CAPITAL LAW FIRM, LLP ("DCC"), sues Defendant, THE HANOVER INSURANCE COMPANY ("Hanover"), and states as follows:

### **JURISDICTION AND VENUE**

1.     This is an action for damages in excess of $30,000, exclusive of interest, costs and attorney's fees.

2.     Plaintiff, DCC, is a Washington, D.C. limited liability partnership that transacts business in the State of Florida.

3.     Defendant, Hanover, is a foreign corporation authorized to conduct the business of insurance in Florida and which, at all times material hereto, conducted the business of insurance in Palm Beach County, Florida.

4.     Venue is proper in this Court because the cause of action accrued in Palm Beach County, Florida.

1

## GENERAL ALLEGATIONS

5.      Hanover issued a Lawyers Professional Liability Insurance Policy LHY D 795443 00 with effective dates of December 21, 2018 through December 21, 2019 (the "Policy").  See attached as **Exhibit "A."**

6.      The Policy is written on a claims-made basis, meaning that coverage applies only to claims first made against the insureds during the policy period or any applicable extended reporting period.

7.      For claims arising out of DCC's Professional Services, the Policy provides a limit of liability of $1,000,000 (each claim, not to exceed $1,000,000 maximum aggregate) and a deductible of $10,000 (each claim).

8.      The Policy provides in relevant part:

**I.  INSURING AGREEMENTS**

**A.1. Professional Services Liability**

The **Insurer** will pay on behalf of the **Insured**, **Loss** which the **Insured** is legally obligated to pay due to a **Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, arising from a **Wrongful Act** in the rendering or failure to render **Professional Services**, provided that:
1. The **Wrongful Act** must have first occurred on or after the applicable Retroactive Date(s);
2. The **Insured** had no knowledge of the **Claim** or facts which could have reasonably caused such **Insured** to foresee the **Claim**, prior to the effective date of this Policy; and
3. The **Claim** or **Potential Claim** is reported to the **Insurer** pursuant to Section X. Reporting.

**III. DEFINITIONS**

**Claim** means any:
A. Oral or written demand received by an **Insured** for monetary or non-monetary relief including injunctive relief;
B. Civil proceeding commenced by the service of a complaint or similar pleading;
C. Formal administrative or regulatory proceeding commenced by the filing of charges, formal investigative order or similar document;
D. Arbitration or mediation proceeding commenced by the receipt of a demand for arbitration or mediation or similar document; or
E. Written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in A. through D. above;
Against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

**Defense Expenses** means the reasonable and necessary legal fees and expenses including attorney fees and expert fees incurred by the **Insurer** or the **Insured** (other than regular or overtime wages, salaries, fees or benefits of **Insured Individuals**) in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to cost of consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds regarding such **Claim**

**Insured** means an **Insured Entity** and any **Insured Individual**.

**Insured Entity** means the **Named Insured** and any **Predecessor Firm**. **Insured Entity** does not include any title agency, title insurance company or any other entity on whose behalf an **Insured Individual** acts as a title agent or designated issuing attorney.

**Insured Individual** means any past, present or future owner, partner, shareholder, employee, **Independent Contractor**, or Of Counsel attorney (including part-time, seasonal, leased or temporary employees), intern or volunteer of an **Insured Entity** while acting solely within his or her capacity and scope of duties on behalf of the **Insured Entity**, **Named Insured**, **Predecessor Firm** or **Non-Profit Entity**. …

**Loss** means **Defense Expenses** and the amount the **Insured** is legally obligated to pay as a result of a **Claim** …

**VII. DEFENSE AND SETTLEMENT OF CLAIMS**

A. The **Insurer** shall have the exclusive right and duty to defend any **Claim** covered by this Policy even if any allegation of such **Claim** is groundless, false or fraudulent….

**X. REPORTING**

A. An **Insured** shall provide the **Insurer** with written notice of a **Claim** as soon as practicable after the **Insured** becomes aware of a **Claim** during the **Policy Period** but in no event later than:
1. Sixty (60) days after the effective date of expiration or termination of the Policy; or
2. The expiration date of the Extended Reporting Period, if applicable, However if the **Insurer** sends written notice to the **Named Insured** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give the **Insurer** written notice of such **Claim** prior to the effective date of such termination.

[Ex. A].

9.     On December 27, 2018, during the Policy Period, DCC first received notice of claims asserted against DCC in a lawsuit filed in the U.S. District Court for the Southern District of Florida, captioned, *Diamond Resorts International, Inc., et. al. v. US Consumer Attorneys, P.A.*, et. al., 9:18-cv-80311 (the "Diamond Action"), currently pending in the West Palm Beach Division before Magistrate Judge Bruce E. Reinhart.

3

10.     A copy of the most recent complaint filed in the Diamond Action (without exhibits thereto) is attached as **Exhibit "B."**

11.     The following causes of action are asserted against DCC in the Diamond Action: (1) Contributory False Advertising in Violation of the Lanham Act; (2) Tortious Interference with Contractual Relations; (3) Civil Conspiracy; and (4) Violation of Florida's Deceptive and Unfair Trade Practices Act.

12.     The claims asserted against DCC in the Diamond Action were first made during the Policy Period and, based on the allegations in the operative complaint, fairly and potentially trigger coverage under the Policy's insuring agreement for Professional Services Liability.

13.     DCC promptly reported the Diamond Action to Hanover pursuant to the Policy's Section X. Reporting, which requires written notice of a claim as soon as practicable "after the insured becomes aware of a claim during the Policy Period."

14.     As such, Hanover was obligated to defend, on behalf of DCC, the claims asserted in the Diamond Action.

15.     However, by letter dated March 11, 2019, Hanover refused to provide a defense and improperly denied coverage for the claims asserted in the Diamond Action.  See attached as **Exhibit "C."**

16.     As the sole basis for its denial, Hanover incorrectly asserted that the Diamond Action was not a claim first made against DCC during the Policy Period.

17.     In this action, DCC seeks damages caused by Hanover's breach of its defense obligations under the Policy, including but not limited to the significant fees and costs incurred by DCC in the defense of the Diamond Action to date.

18.     All conditions precedent to this action have occurred, have been performed, or have been excused or waived.  Alternatively, Hanover has not been prejudiced by the non-occurrence or non-performance of any condition precedent.

19.     DCC has been required to retain the undersigned law firm to prosecute this action and is obligated to pay his attorneys a reasonable fee for services provided in connection with this matter.

### COUNT I – BREACH OF CONTRACTUAL DUTY TO DEFEND

20.     Plaintiff re-alleges the allegations in paragraphs 1 though 19 as if fully set forth herein.

21.     Hanover provided professional liability insurance coverage to DCC under Policy Number LHY D 795443 00 with effective dates of December 21, 2018 through December 21, 2019.  [Ex. A].

22.     On December 27, 2018, during the Policy Period, DCC first received notice of the claims asserted in the Diamond Action.

23.     The claims asserted against DCC in the Diamond Action were first made against DCC during the Policy Period and arise from one or more alleged Wrongful Acts in the rendering or failure to render Professional Services.

24.     The alleged Wrongful Acts, which form the alleged basis of the Diamond Action, first occurred on or after the applicable Retroactive Date.

25.     DCC had no knowledge of the claims asserted in the Diamond Action, or facts which could have reasonably caused DCC to foresee the Diamond Action, prior to the effective date of the Hanover Policy.

26.     DCC promptly reported the claims to Hanover pursuant to the Policy's Section X. Reporting.

27.     Pursuant to Hanover's Policy, Hanover was obligated to perform certain duties, including the duty to defend DCC, because the claims asserted against DCC in the Diamond Action fairly and potentially implicate the coverage under the Policy and/or are covered claims for which no policy exclusion applies.

28.     However, Hanover breached its duties under the terms of the Policy by failing to defend DCC with regard to the Diamond Action.

29.     As a result of Hanover's breach, DCC has suffered damages including, but not limited to, the significant attorney's fees and costs incurred by DCC in defense of the Diamond Action to date.

WHEREFORE, Plaintiff demands judgment against Hanover for damages, including, but not limited to, attorney's fees and costs incurred by Plaintiffs in defense of the Diamond Action, pre- and post-judgment interest, and the costs of this action, attorney's fees pursuant to Fla. Stat. §626.9373, §627.428, or similar authorizing statute, and such other relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 10th day of March, 2022.

Respectfully submitted,

_/s/ Robert C. Hubbard_____
George A. Vaka, Esquire
Florida Bar No.: 374016
Robert C. Hubbard, Esquire
Florida Bar No.: 098996
**VAKA LAW GROUP, P.L.**

777 S. Harbour Island Blvd., Ste. 300
Tampa, Florida 33602
Phone: (813) 549-1799
Fax:    (813) 549-1780
gvaka@vakalaw.com
rhubbard@vakalaw.com
kpeterson@vakalaw.com
***Counsel for Plaintiff***

# Exhibit A



**HANOVER**

# Lawyers Advantage

**Professional Liability Insurance**

*RPG Policy Declarations*

**NOTICE: THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMITS OF LIABILITY CAN BE COMPLETELY EXHAUSTED BY DEFENSE EXPENSES AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE DEDUCTIBLE. THE INSURER WILL HAVE NO LIABILITY FOR DEFENSE EXPENSES OR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY**

| Policy Number | The Hanover Insurance Company |
|---|---|
| LHY D795443 00 | 440 Lincoln Street<br>Worcester, MA 01653 |
| | (A Stock Insurance Company, herein called the **Insurer**) |

### RISK PURCHASING GROUP NOTICE

**This Lawyers Professional Liability Risk Purchasing Group Policy is not protected by an insurance insolvency guaranty fund in this state, and the insurer or Risk Purchasing Group may not be subject to all the insurance laws and rules of this state.**

### IMPORTANT NOTICE REGARDING RISK PURCHASING GROUPS

**Disclosure Pursuant to Federal Law Regarding Purchasing Groups [15 U.S.C. SEC. 3901, et seq] the USIWashDC is a "Purchasing Group", as defined under Federal law, formed to purchase liability insurance on a group basis for its Members to cover the similar or related liability exposure(s) to which the Members of the Purchasing Group are exposed by virtue of their related, similar, or common businesses or services. Members do not share limits and each member is provided with its own policy and/or evidence of insurance.**

**Item 1.    NAMED INSURED AND ADDRESS**

DC Capital Law
700 12th St, NW
Suite 700
Washington, DC 20005

**Item 2.    POLICY PERIOD**

Inception Date: 12/21/2018  Expiration Date: 12/21/2019

(12:01 AM standard time at the address shown in Item 1)



**HANOVER**
# Lawyers Advantage
**Professional Liability Insurance**

*RPG Policy Declarations*

**Item 3.     INSURING AGREEMENTS**

| Insuring Agreement | Limits | Deductible |
|---|---|---|
| A.1. Professional Services Liability - (*Including Privacy Breach and Security Breach*) | $1,000,000 each **Claim** not to exceed;<br>$1,000,000    Maximum Aggregate | $10,000 each **Claim**<br>N/A all **Claims** |
| A.2. Subpoena Assistance Sublimit | $1,000,000 each **Subpoena** not to exceed;<br>$1,000,000    Maximum Aggregate | $10,000 each **Subpoena** |
| B.    Disciplinary Proceedings | $50,000 each **Disciplinary Proceeding** not to exceed;<br>$100,000    Maximum Aggregate | $0 each **Disciplinary Proceeding** |
| C.    Loss of Earnings | $500    each Day<br>$20,000 each **Insured**<br>$50,000    Maximum Aggregate | Not Applicable |
| D.    Crisis Event Expenses | $25,000 each **Crisis Event** not to exceed;<br>$50,000    Maximum Aggregate | $0 each **Crisis Event** |
| E.    Breach Event Expenses And Cyber Investigation Expenses | $50,000 each **Privacy Event** or **Security Breach** or each **Regulatory Investigation** not to exceed;<br>$50,000    Maximum Aggregate | Not Applicable |
| F.    Reputation Protection Expenses | $25,000 each **Reputation Event** not to exceed;<br>$50,000    Maximum Aggregate | Not Applicable |
| G.    Withheld Client Fee Assistance | $10,000    Maximum Aggregate | Not Applicable |

**Item 4.     RETROACTIVE DATE**:                              12/21/2017

**Item 5.     PREMIUM**                                        $23,497.00
          **Total:**                                          $23,497.00

          *See State Surcharge Notice(s) to Policyholder, if applicable*

**Item 6.     ENDORSEMENTS EFFECTIVE AT INCEPTION:** See Schedule of Forms attached.



**HANOVER**

# Lawyers Advantage

**Professional Liability Insurance**

*RPG Policy Declarations*

**Item 7.**     **NOTICE TO INSURER**

Report a claim to the Company as required to:

The Hanover Insurance Company
440 Lincoln Street
Worcester, MA 01653

**National Claims Telephone Number**:  1-800-628-0250, extension 8556281
**Facsimile:**  508-926-4789
**Email:**  lawyerclaim@hanover.com

---

**Agent on behalf of:**                 USI INSURANCE SERVICES LLC

ONE INTERNATIONAL PLAZA
PHILADELPHIA, PA 19113

---

We have caused this Policy to be signed by our President and Secretary and countersigned where required by a duly
authorized agent of the Company.

John C. Roche, President                                    Charles F. Cronin, Secretary



**Lawyers Advantage**
**Professional Liability Insurance Policy Index**

| | | |
|---|---|---:|
| **I.** | **INSURING AGREEEMENT** | **1** |
| | **A.1.Professional Services Liability** | **1** |
| | **A.2.Subpoena Assistance Sublimit** | **1** |
| | **B.   Disciplinary Proceedings** | **1** |
| | **C.   Loss of Earnings** | **1** |
| | **D.   Crisis Event Coverage** | **1** |
| **II.** | **EXTENDED REPORTING PERIODS** | **1** |
| | **A.   Automatic Extended Reporting Period** | **1** |
| | **B.   Optional Extended Reporting Period** | **2** |
| | **C.   Death or Disability Extended Reporting Period** | **2** |
| | **D.   Non-Practicing Extended Reporting Period** | **2** |
| **III.** | **DEFINITIONS** | **2** |
| **IV.** | **EXCLUSIONS** | **7** |
| | **A.   Prior Notice** | **7** |
| | **B.   Retroactive Date** | **7** |
| | **C.   Conduct** | **7** |
| | **D.   ERISA** | **8** |
| | **E.   Insured vs. Insured** | **8** |
| | **F.   Beneficiary or Distributee of Trust or Estate** | **8** |
| | **G.   Contract** | **8** |
| | **H.   Bodily Injury or Property Damage** | **8** |
| | **I.   Title Insurance** | **8** |
| | **J.   Employment Practices** | **8** |
| | **K.   Outside Entities** | **8** |
| | **L.   Public Official** | **9** |
| | **M.  Management Capacity** | **9** |
| | **N.   Common Office Space** | **9** |
| | **O.   False Pretenses** | **9** |
| **V.** | **SPOUSES, DOMESTIC PARTNERS ESTATES AND LEGAL REPRESENTATIVES** | **9** |
| **VI.** | **INNOCENT INSUREDS** | **9** |
| **VII.** | **DEFENSE AND SETTLEMENT OF CLAIMS** | **10** |
| **VIII.** | **LIMIT OF LIABILITY** | **10** |
| **IX.** | **DEDUCTIBLE** | **11** |
| **X.** | **REPORTING** | **11** |
| **XI.** | **ALLOCATION** | **12** |
| **XII.** | **OTHER INSURANCE AND INDEMNITY** | **12** |
| **XIII.** | **RELATED CLAIMS** | **12** |
| **XIV.** | **LEGAL PROCEEDINGS** | **12** |



**Lawyers Advantage**
**Professional Liability Insurance Policy Index**

| | | |
|---|---|---|
| XV. | **MATERIAL CHANGE** | **13** |
| | A. **Merger or Acquisition of Named Insured** | **13** |
| | B. **Cessation of Insured Entities** | **13** |
| | C. **Additional Entities or Insured Individuals** | **13** |
| | D. **(Paragraph concerning loss, suspension, revocation or surrender of an insured individuals license to practice law.)** | **13** |
| XVI. | **SUBROGATION** | **14** |
| XVII. | **TERRITORY** | **14** |
| XVIII. | **TERMINATION OF POLICY** | **14** |
| XIX. | **BANKRUPTCY** | **14** |
| XX. | **VALUATION AND FOREIGN CURRENCY** | **14** |
| XXI. | **ROLE OF NAMED INSURED** | **14** |
| XXII. | **TITLES AND HEADINGS** | **15** |
| XXIII. | **CONFORMANCE TO LAW AND TRADE SANCTIONS** | **15** |
| XXIV. | **REPRESENTATIONS AND SEVERABILITY** | **15** |

*THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.*
*PLEASE READ THE POLICY CAREFULLY.*

In consideration of the premium paid, in reliance upon the statements in the **Application** and subject to the Declarations, limitations, conditions, definitions and other provisions of this Policy, including endorsements hereto, the **Insurer** and the **Insureds** agree as follows:

## I. INSURING AGREEMENTS

### A.1. Professional Services Liability

The **Insurer** will pay on behalf of the **Insured**, **Loss** which the **Insured** is legally obligated to pay due to a **Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, arising from a **Wrongful Act** in the rendering or failure to render **Professional Services**, provided that:

1. The **Wrongful Act** must have first occurred on or after the applicable Retroactive Date(s);

2. The **Insured** had no knowledge of the **Claim** or facts which could have reasonably caused such **Insured** to foresee the **Claim**, prior to the effective date of this Policy; and

3. The **Claim** or **Potential Claim** is reported to the **Insurer** pursuant to Section X. Reporting.

### A.2. Subpoena Assistance Sublimit

The **Insurer** will reimburse the **Insured** for **Subpoena Response Expenses** arising out of a **Subpoena** first received by an **Insured** during the **Policy Period**.

### B. Disciplinary Proceedings

The **Insurer** will pay on behalf of the **Insured Disciplinary Proceeding Expenses** arising out of **Disciplinary Proceedings** commenced against an **Insured Individual** during the **Policy Period**.

### C. Loss of Earnings

The **Insurer** will reimburse the **Insured** for loss of earnings due to such **Insured Individual's** attendance, at the **Insurer's** written request, at a trial, hearing, mediation, arbitration or other alternative dispute resolution proceeding.

### D. Crisis Event Expenses

The **Insurer** will reimburse the **Insured** for **Crisis Event Expenses** arising out of a **Crisis Event** which first occurs during the **Policy Period**.

## II. EXTENDED REPORTING PERIODS

The following Extended Reporting Periods apply only to Insuring Agreement I.A.1. Professional Services Liability:

### A. Automatic Extended Reporting Period

If the **Insurer** or the **Named Insured** terminates or does not renew this Policy then the **Named Insured** shall have the right to a sixty (60) day Automatic Extended Reporting Period beginning on the effective date of termination or non-renewal of this Policy. There is no additional premium for the Automatic Extended Reporting Period. The Automatic Extended Reporting Period applies to **Claims** made during the **Policy Period** and reported to the **Insurer** during the Automatic Extended Reporting Period but only for **Wrongful Acts** committed prior to the effective date this Policy is terminated or non-renewed, and subject to all to other terms and conditions of this Policy.

If the Optional Extended Reporting Period outlined below is purchased by the **Named Insured** then the Automatic Extended Reporting Period shall not apply.

B.  Optional Extended Reporting Period

If the **Insurer** or the **Named Insured** terminates or does not renew this Policy, other than termination by the **Insurer** for nonpayment of premium, then the **Named Insured** shall have the right to purchase an Extended Reporting Period for the period set forth in Item 5. of the Declarations beginning on the effective date of the termination or non-renewal of this Policy. The **Named Insured** must provide a written request for the Extended Reporting Period including payment of the additional premium, as set forth in Item 5. of the Declarations, within sixty (60) days following the effective date of the termination or non-renewal of this Policy. Additional premium paid shall be deemed fully earned as of the first day of the Extended Reporting Period and the Extended Reporting Period may not be cancelled.

C.  Death or Disability Extended Reporting Period

If an **Insured Individual** dies or becomes totally and permanently disabled, and does not have other available insurance, the **Insurer** will issue an endorsement for an Extended Reporting Period for such **Insured Individual** of unlimited duration for no additional premium, provided:

1.  Death was not caused by a self-inflicted injury or misuse or abuse of any substance;

2.  Total and permanent disability is established after the effective date of the Policy and must be a result of accidental bodily injury, physical illness or disease, and not arise out of any self-inflicted injury or attempted suicide, or the abuse of intoxicants or controlled substances.  The inability to practice law must be certified in writing by a physician acceptable to the **Insurer**.

In the event of death, such **Insured Individual's** estate, heirs, executors or administrators must, within sixty (60) days of the expiration of the **Policy Period**, provide the **Insurer** with written proof of the date of death.

In the event of total and permanent disability such **Insured Individual** or the **Insured Individual's** legal guardian must, within sixty (60) days of the expiration of the **Policy Period**, provide the **Insurer** with written proof that such **Insured Individual** is totally and permanently disabled including the date the disability commenced, certified by the **Insured Individual's** physician.  The **Insurer** shall have the right to request, and the **Insured Individual** must agree, that the **Insured Individual** submit to medical examinations by any physician designated by the **Insurer** at the **Insurer's** expense.

D.  Non-Practicing Extended Reporting Period

If an **Insured Individual** permanently retires or otherwise voluntarly ceases the practice of law the **Insurer** will issue an endorsement for an Extended Reporting Period for such **Insured Individual** of unlimited duration for no additional premium provided:

1.  The **Insured Individual** has been continuously insured with the **Insurer** for the immediately preceding three (3) years; and

2.  Has reached the age of 55.

If an **Insured Individual** leaves the practice of law as a result of loss, suspension, revocation or surrender of the **Insured Individual's** license because of threatened, pending or actual disciplinary action the Extended Reporting Periods outlined above are not available.

III.  **DEFINITIONS**

**Application** means:

A.  Any portion of an application given to the **Insurer** for this Policy including any attachments, written information and materials provided to the **Insurer** by or on behalf of an **Insured** for the purposes of the **Insurer's** underwriting of this Policy; and

Lawyers Advantage

**Professional Liability Insurance**

B. Any warranty provided to the **Insurer** within the past three years in connection with any coverage part or Policy of which this Policy is a renewal or replacement.

**Breach Notice Law** means any federal, state, local or foreign privacy legislation, regulation and their functional equivalent that requires an entity to provide notice to affected natural persons of any actual or potential unauthorized access to their **Confidential Records**.

**Claim** means any:

A. Oral or written demand received by an **Insured** for monetary or non-monetary relief including injunctive relief;

B. Civil proceeding commenced by the service of a complaint or similar pleading;

C. Formal administrative or regulatory proceeding commenced by the filing of charges, formal investigative order or similar document;

D. Arbitration or mediation proceeding commenced by the receipt of a demand for arbitration or mediation or similar document; or

E. Written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in A. through D. above;

Against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

**Computer** means a device or group of hardware devices on which software, applications, script, code and computer programs containing **Data** can be operated and viewed.

**Confidential Record** means:

A. A natural person's first name or first initial and last name in combination with:

1. Non-public personally identifiable information, as defined in applicable federal, state, local or foreign legislation or regulations including, social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

2. Financial account number (including a bank account number, retirement account number or healthcare spending account number);

3. Credit, debit or payment card numbers;

4. Information related to employment by an **Insured**;

5. Individually identifiable information considered nonpublic personal information pursuant to Title V of the Gramm-Leach Bliley Act of 1999, as amended; or

6. Individually identifiable information considered protected health information pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended;

B. Trade secrets, data, designs, interpretations, forecasts, formulas, methods, practices, processes, reports or other information not included in 1. through 6. above;

which is owned by an **Insured** or for which an **Insured** is legally liable and is intended by an **Insured** to be accessible only by natural persons or entities it has specifically authorized to have such access.

**Crisis Event** means:

A. A **Wrongful Act**;

B. A potential dissolution of the **Named Insured**;

C. Death, serious illness or departure of a principal, partner, owner, director, executive officer, risk manager or in-house general counsel of the **Named Insured**;

D. Incident of workplace violence; or

E.   Another event as agreed at the sole discretion of the **Insurer**;

that the **Named Insured** reasonably believes will have a material adverse effect upon the reputation of the **Named Insured**.

**Crisis Event Expenses** means reasonable fees, costs and expenses for consulting services incurred by the **Insured** provided by a public relations firm in response to a **Crisis Event**.

**Cyber Attack** means the transmission of fraudulent or unauthorized **Data** that is intended to and successfully modifies, alters, damages, destroys, deletes, records, transmits, or consumes information within a **System** without authorization, including **Data** that is self-replicating or self-propagating, and which causes the disruption of the normal operation of a **System**.

**Data** means a representation of information, knowledge, facts, concepts or instructions which are being processed or have been processed in a **Computer**.

**Defense Expenses** means the reasonable and necessary legal fees and expenses including attorney fees and expert fees incurred by the **Insurer** or the **Insured** (other than regular or overtime wages, salaries, fees or benefits of **Insured Individuals**) in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to cost of consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds regarding such **Claim**.

**Disciplinary Proceeding** means any formal administrative or regulatory proceeding by a regulatory or disciplinary official or agency to investigate or prosecute charges alleging professional misconduct or ethical violations in the performance of an **Insured's Professional Services**.

**Disciplinary Proceeding Expenses** means all expenses the **Insurer** or, with the **Insurer's** prior written consent, the **Insured** incur in investigation, defense or appeal of any **Disciplinary Proceeding**.

**Financially Impaired** means the status of an **Insured** resulting from:

A.   The appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an **Insured**; or

B.   Such **Insured** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Independent Contractor** means any natural person who performs **Professional Services** under contract with, and at the sole direction and control of, an **Insured**, provided that such **Professional Services** inure to the benefit of the **Named Insured**.

**Insured** means an **Insured Entity** and any **Insured Individual**.

**Insured Entity** means the **Named Insured** and any **Predecessor Firm**.  **Insured Entity** does not include any title agency, title insurance company or any other entity on whose behalf an **Insured Individual** acts as a title agent or designated issuing attorney.

**Insured Individual** means any past, present or future owner, partner, shareholder, employee, **Independent Contractor**, or Of Counsel attorney (including part-time, seasonal, leased or temporary employees), intern or volunteer of an **Insured Entity** while acting solely within his or her capacity and scope of duties on behalf of the **Insured Entity**, **Named Insured**, **Predecessor Firm** or **Non-Profit Entity**.

**Insurer** means the entity issuing this Policy as designated on the Policy Declarations.

**Loss** means **Defense Expenses** and the amount the **Insured** is legally obligated to pay as a result of a **Claim** including:

A.   Monetary judgments, awards or settlements, pre-judgment interest and post-judgment interest, back and front pay, compensatory damages;

B. Punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the law of the jurisdiction most favorable to the insurability of such damages where such jurisdiction has a substantial relationship to the **Insured**, the **Insurer**, or to the **Claim** giving rise to such damages;

However, **Loss** does not include:

1. Any amount which an **Insured** is obligated to pay as a result of a **Disciplinary Proceeding**;

2. Any amount which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress for non-monetary damages including injunctive relief;

3. Any amount deemed uninsurable by law; or

4. Fines, penalties, sanctions, taxes or fees.

**Media** means electronic applications, software, scripts and programs on which **Data** is stored so that it can be collected read, retrieved or processed by a **Computer**.  **Media** does not mean paper, or other tangible property, money, debt, equity, instruments, accounts, bonds, bills, records, abstracts, deeds or manuscripts.

**Named Insured** means the person or entity set forth in Item 1. of the Declarations.

**Non-Profit Entity** means any entity described in section 501(c)3, 501(c)4, 501(c)7, 501(c)10, of the Internal Revenue Code of 1986, as amended.

**Non-Profit Services** means service by an **Insured Individual** in a **Non-Profit Entity** as any director, officer, trustee, regent, governor, manager or member of the Board of Managers including any equivalent executive position of any of the foregoing but solely during the time that such service is with the knowledge and express consent of an **Insured Entity**.

**Personal Injury Offense** means:

A. Defamation of character, libel, slander, or publication of material in violation of an individual's right of privacy;

B. Wrongful entry or eviction or other invasion of the right of privacy; or

C. False arrest, wrongful detention or imprisonment, malicious prosecution, malicious use or abuse of process.

**Policy Period** means the period of time from the inception date shown in Item 2. of the Declarations to the earlier of the expiration date shown in Item 2. of the Declarations or the effective date of termination of this Policy.

**Potential Claim** means any **Wrongful Act**, facts or other circumstances which may subsequently give rise to a **Claim**.

**Predecessor Firm** means any law firm or legal entity that, prior to the Inception Date shown in Item 2. of the Declarations:

A. Is dissolved or inactive and is no longer rendering **Professional Services**; and

B. Some or all of such firm's principals, owners, officers, or partners have joined the **Named Insured** and more than fifty percent (50%) of such firm's assets have been assigned or transferred to the **Named Insured**.

**Privacy Breach** means:

A. The **Insured Entity's** failure to protect a **Confidential Record** including a **Cyber Attack** on the **Insured's Entity's System** or the actions of a **Rogue Employee** which directly results in the unauthorized disclosure of one or more **Confidential Records**;

B. The theft or negligent loss of hardware, **Media**, **System Output**, **Data** or other documents owned or controlled by, or on behalf of, an **Insured Entity** on which **Confidential Records** are stored or recorded;

C. The **Insured's** negligent failure to disclose an event referenced in A. or B. above in violation of any **Breach Notice Law**; or

D.  The **Insured's** negligent violation of any applicable federal, state, foreign or local privacy legislation or regulation in connection with any **Claim**.

**Professional Services** means:

A.  Services as a lawyer, mediator, arbitrator, notary public, administrator, conservator, receiver, executor,

guardian, trustee, or in any similar fiduciary capacity, but only if the services rendered are those ordinarily performed by a lawyer;

B.  Services as a law clerk, paralegal, legal secretary or other legal support staff;

C.  Services (including title opinions or title certifications) performed for others for a fee as a title insurance agent, title abstractor, title searcher, escrow agent, or closing agent;

D.  Services as a speaker, author of legal treatises or lobbyist;

E.  Activities as a member of a formal accreditation, ethics, peer review, licensing board, standards review, bar association or similar professional board or committee; and

Pro-bono services in any of the above capacities which are customarily performed for others with the knowledge and consent of the **Named Insured.**

**Professional Services** does not mean

A.  Services provided as a public official or an employee or representative of a governmental body, subdivision or agency unless such status is due only to the legal services rendered under contract.

B.  Services rendered as a notary in which an **Insured** provides notarization without the signor being present;

C.  Services rendered in relation to or as the promoter, seller or solicitor of securities, real estate or  other investments; or

D.  Any activity in the **Insured's** capacity as a Certified Public Accountant, Insurance Broker or Agent or Real Estate Broker or Agent.

**Publishing Offense** means:

A.  Oral, written, or electronic publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products, or services, provided that the **Claim** is made by a person or entity that claims to have been slandered or libeled, or whose goods, products, or services have allegedly been disparaged.

B.  Oral, written, or electronic publication of material that appropriates a person's likeness, unreasonably places a person in false light, or gives unreasonable publicity to a person's private life.

**Related Claims** means all **Claims** based upon, arising from or in any way related to the same facts, circumstances, situations, transactions or events or the same series of facts, circumstances, situations, transactions or events.

**Related Wrongful Acts** means **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision.

**Rogue Employee** means a permanent employee of an **Insured Entity** who has gained unauthorized access or has exceeded authorized access to a **System** or **Confidential Records** owned or controlled by the an **Insured Entity** or an entity that is authorized by an **Insured** to hold, process or store **Confidential Records** for the exclusive benefit of the **Insured Entity.**

**Security Breach** means:

A.  The failure or violation of the security of the **Insured Entity's System** including the impairment or denial of access to the **Insured Entity's System**, a **Cyber Attack** or unauthorized acts or omissions by a **Rogue Employee** which damages or harms the **Insured Entity's System** or the **System** of a third party with whom the **Insured Entity** provides services for a fee;

B.  The theft or loss of hardware or **Media** controlled by, or on behalf of, an **Insured Entity** on which **Data** is stored; or

C.  The failure to disclose an event in A. or B. above which violates any **Breach Notice Law**.

**Subpoena** means a subpoena received by an **Insured** for documents or testimony arising out of the **Insured's** rendering of **Professional Services** provided that:

A.  The subpoena arises out of a lawsuit to which an **Insured** is not a party; and

B.  The **Insured** has not been engaged to provide advice or testimony in connection with the lawsuit or has provided such advice or testimony in the past.

**Subpoena Response Expenses** means attorney legal fees and costs incurred by an attorney retained by the **Insurer** in response to a **Subpoena**. Such payments are included in the Limit of Liability and are subject to the Deductible. Any notice given to the **Insurer** of such **Supoena** will be deemed notification of a **Potential Claim**.

**System** means a **Computer**, **Media** and all input, output, processing storage and communication devices controlled, supervised or accessed by the operation systems that are proprietary to, or licensed to, the owner of the **Computer**.

**System Output** means a tangible substance on which one or more **Confidential Records** are printed from a **System**.

**Wrongful Act** means any actual or alleged negligent act, error, omission, misstatement, misleading statement, breach of duty, **Publishing Offense** or **Personal Injury Offense** committed or attempted, or allegedly committed or attempted, or a **Privacy Breach** or **Security Breach** allowed, by an **Insured** in the rendering of, or failure to render **Professional Services** or **Non-Profit Services**.  All **Related Wrongful Acts** shall be considered a single **Wrongful Act** and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

## IV.  EXCLUSIONS

This insurance does not apply to **Loss** for any **Claim**:

A.  Prior Notice

Based upon, arising out of or in any way related to any **Claim**, **Wrongful Act**, investigation, proceeding, act, event, transaction, decision, fact, circumstance or situation which has been the subject of any notice given to any other **Insurer**, under any similar policy of which this Policy is a direct or indirect renewal or replacement.

B.  Retroactive Date

Based upon, arising out of or in any way related to any act which occurred or litigation, administrative or arbitration proceeding, written demand pending against, or any order, decree or judgment entered prior to the Retroactive Date set forth in Item 4. of the Declarations.

C.  Conduct

Based upon, arising out of or in any way related to:

1.  Any deliberate dishonest or fraudulent act or omission or willful violation of any statute or regulation by an **Insured**; or

2.  An **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled including but not limited to conversion, commingling, defalcation, misappropriation or other intentional misuse or illegal use of funds, money or property;

However this Exclusion shall not apply to **Defense Expenses** unless and until a final or non-appealable judgment or adjudication in any underlying proceeding or action establishes an **Insured** committed such an act or omission, violation of statute or regulation or gained such profit, remuneration or advantage to which the **Insured** was not legally entitled.

No conduct pertaining to any **Insured Individual** shall be imputed to any other **Insured Individual** for the purpose of determining the applicability of this Exclusion.

D. ERISA

For any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Health Insurance Portability and Accountability Act of 1996, all as amended, and any similar federal, state, local or common law or statutory law anywhere in the world, and any rules and regulations promulgated thereunder.

E. Insured vs. Insured

Brought by or on behalf of any **Insured** unless such **Claim** arises from the **Insured's** rendering of **Professional Services**.

F. Beneficiary Or Distributee of Trust or Estate

Based upon, arising out of or in any way related to a **Claim** made against an **Insured** as a beneficiary or distributee of any trust or estate.

G. Contract

Based upon, arising out of or in any way related to liability assumed through, or on account of, any oral or written contract or agreement to which an **Insured** is a party, however this Exclusion shall not apply to liability that would have attached in the absence of such contract or agreement.

H. Bodily Injury or Property Damage

For the physical injury to or destruction of any tangible property, including loss of use of that property and loss of use of property that is not physically damaged; or for bodily injury, mental anguish (except mental anguish and emotional distress arising from **Personal Injury Offense**), humiliation, emotional distress, disability, sickness, disease, death, assault or battery sustained by any individual; however this Exclusion shall not apply to any **Claim** directly arising out of **Professional Services** performed as a guardian, conservator or committee of any person or property.

I. Title Insurance

Based upon, arising out of or in any way related to:

1. Any defects in title of which the **Insured** had knowledge at the date of issuance of such title insurance but failed to disclose to the title insurance company;

2. Any breach of underwriting authority in the **Insured's** capacity as a Title Insurance Agent.

J. Employment Practices

Based upon, arising out of or in any way related to any:

1. Employment-related **Wrongful Act**;

2. Discrimination against or sexual harassment of any third party;

3. Federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act.

K. Outside Entities

Based upon, arising out of or in any way related to any entity which is not an **Insured Entity** and:

**The Hanover Insurance Group™**

**Lawyers Advantage**

**Professional Liability Insurance**

1. Is a publicly traded company in which an **Insured** holds an interest of more than five percent (5%);

2. Is a privately owned entity in which an **Insured** holds an interest of fifteen percent (15%) as a partner, member, principal or stockholder or creditor;

3. Employs an **Insured Individual**;

4. Is directly or indirectly operated, controlled or managed by an **Insured**.

L. <u>Public Official</u>

Based upon, arising out of or in any way related to any **Insured's** capacity as a public official, or employee of a government body, subdivision or agency, provided that this Exclusion will not apply to **Professional Services** rendered for such government body, subdivision or agency.

M. <u>Management Capacity</u>

Based upon, arising out of or in any way related to any **Insured Individual's** capacity as a director or officer of any entity other than the **Named Insured**, provided however this Exclusion shall not apply to the **Insured Individual's** capacity as a director or officer of a **Non-Profit Entity**.

N. <u>Common Office Space</u>

For a **Wrongful Act** of any person or entity with whom the **Insured** shares a common office space at the **Insured's** premises and who is not an **Insured** under this Policy; or

Brought against and **Insured** if such **Claim** arises solely out of a **Wrongful Act** of any other person or lawyer who is not an **Insured** including but not limited to claims based upon theories of partnership by estoppel, apparent partnership, apparent agency, ostensible agency, vicarious liability or any similar theory.

O. <u>False Pretenses</u>

Based upon, arising out of or in any way related to the transfer, payment or delivery of funds, money or property caused or induced by trick, artifice, or the fraudulent misrepresentation of a material fact (including but not limited to social engineering, pretexting, phishing, spear phishing or any other confidence trick).

## V.   SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES

Coverage shall extend to:

A. A lawful spouse or domestic partner, as defined under any applicable federal, state or local law, of an **Insured Individual** solely by reason of such person's status as spouse or domestic partner or such person's ownership interest in property which the claimant seeks as recovery from an **Insured Individual**;

B. The estate, heirs, legal representatives or assigns of an **Insured Individual** if such **Insured Individual** is deceased, legally incompetent, insolvent or bankrupt.

Coverage shall not apply to **Loss** for **Claims** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an **Insured Individual's** spouse, domestic partner, heir, estate, legal representative or assigns.

## VI.   INNOCENT INSUREDS

If coverage under this Policy would be excluded, suspended or lost because any **Insured** concealed a **Claim** from the **Insurer** coverage shall apply to any other **Insured** who did not participate in, acquiesce in or fail to promptly notify the **Insurer** of such concealment, provided that the **Insured** complied with all other terms, conditions and

**The Hanover Insurance Group™**

**Lawyers Advantage**

**Professional Liability Insurance**

provisions of this Policy.  The **Insurer** has the right to recover against any **Insured** responsible for dishonest, criminal, malicious or fraudulent acts, errors, omissions, discrimination, concealment or any other illegal act, whether or not intentional, for **Loss** paid pursuant to this section.

**VII.   DEFENSE AND SETTLEMENT OF CLAIMS**

A.   The **Insurer** shall have the exclusive right and duty to defend any **Claim** covered by this Policy even if any allegation of such **Claim** is groundless, false or fraudulent.   However, if an **Insured** is entitled under applicable law to select defense counsel, then such defense counsel shall comply with the **Insurer's** customary rates and litigation guidelines regarding billing, staffing and reporting.   The **Insurer** has no duty to defend any **Claim** or pay **Defense Expenses** for **Claims** to which this insurance does not apply.

B.   The right and duty to defend a **Claim** covered under this Policy shall cease when the applicable Aggregate Limit of Liability for such Insuring Agreement in Item 3. of the Policy Declarations has been exhausted by the payment of **Loss** and the applicable premium shall be deemed fully earned.

C.   The **Insureds** shall provide all information in connection with any **Claim** and cooperate with the **Insurer** in the investigation, defense and settlement of any **Claim**.

D.   No **Insured** shall settle any claim, admit any liability, waive any rights or, except at the **Insured's** own cost, voluntarily make any payment, assume any obligation, or incur any expense related to a **Claim** without the **Insurer's** prior written consent.

E.   The **Insurer** may make any investigation it deems necessary and settle any **Claim** subject to the **Named Insured's** written consent to settle which shall not be unreasonably withheld. If any **Insured** refuses to consent to the settlement of any **Claim** which the **Insurer** recommends and which is acceptable to the claimant, subject to the applicable Limit of Liability or Deductible, the **Insurer's** liability for all **Loss** from such **Claim** shall not exceed:

1.   The amount the **Insurer** would have contributed to the settlement including **Defense Expenses** incurred up to the date of such refusal; and

2.   Eighty percent (80%) of such **Loss** in excess of the amount for which the **Claim** would have been settled.

F.   The **Insurer** shall not seek repayment from an **Insured Individual** of any **Defense Expenses** paid by the **Insurer** that are deemed uninsured pursuant to Exclusion C. Conduct, unless the applicable determination standard set forth in such Exclusion has been met.

G.   If the **Insurer** is prevented by law or otherwise unable to defend or investigate a **Wrongful Act** that occurred outside the United States, the **Insured** under our supervision may arrange for the investigation, appointment of counsel and defense of such **Claim**.   Subject to the applicable Limit of Liability and Deductible, the **Insurer** will reimburse the **Insured** for any reasonable and necessary **Defense Expenses** for such **Claim**.

**VIII.   LIMIT OF LIABILITY**

Regardless of the number of **Insureds**, **Claims**, or claimants the **Insurer's** liability under this Policy is limited as follows:

A.   The applicable Limit of Liability for each **Claim** shown in Item 3.A.1. of the Declarations is the **Insurer's** maximum liability for all **Loss** arising from a single **Claim** or **Related Claims**.   The applicable Maximum Aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all **Loss** arising from all **Claims** or **Related Claims** during the **Policy Period**.

**The Hanover Insurance Group™**

B.  The applicable Limit of Liability for each **Subpoena** in Item 3.A.2. of the Declarations is the **Insurer's** maximum liability for all **Subpoena Response Expenses** arising from a single **Subpoena**. The applicable Maximum Aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all **Subpoena Response Expenses** arising from all **Subpoena's** during the **Policy Period**. **Subpoena Response Expenses** are part of and not in addition to the **Professional Services** Limits of Liability.

C.  The applicable Limit of Liability for each **Disciplinary Proceeding** shown in Item 3.B. of the Declarations is the **Insurer's** maximum liability for all **Disciplinary Proceedings Expenses** arising from a single **Disciplinary Proceeding**. The applicable Maximum Aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all **Disciplinary Proceeding Expenses** arising from all **Disciplinary Proceedings** during the **Policy Period**.

D.  The applicable Limit of Liability for loss of earnings for each day shown in Item 3.C. of the Declarations is the **Insurer's** maximum liability for all loss of earnings each day arising from a single appearance. The applicable each **Insured** Limit of Liability for loss of earnings for each **Insured** shown in the Declarations is the **Insurer's** maximum liability for all loss of earnings for each **Insured** arising from a single appearance. The applicable Maximum aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all loss of earnings arising from all appearances during the **Policy Period**.

E.  The applicable Limit of Liability for each **Crisis Event** shown in Item 3.D. of the Declarations is the **Insurer's** maximum liability all **Crisis Event Expenses** arising from a single **Crisis Event**. The applicable Maximum Aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all **Crisis Event Expenses** arising from all **Crisis Events** during the **Policy Period**.

F.  **Disciplinary Proceeding Expenses**, **Crisis Event Expenses** and loss of earnings are in addition to, and not part of, the **Professional Services** Limits of Liability.

## IX.   DEDUCTIBLE

A.  The **Insurer's** liability under this Policy applies only to that part of covered **Loss**, **Subpoena Response Expenses**, **Disciplinary Proceedings Expenses** or **Crisis Event Expenses** which is in excess of the applicable Deductible for each **Claim**, **Disciplinary Proceeding**, appearance or **Crisis Event** stated in Item 3. of the Declarations. Such Deductible shall be borne by the **Insureds** uninsured and at their own risk.

B.  The most an **Insured** will pay for covered **Loss** for all **Claims** made during the **Policy Period** will not exceed the applicable Deductible amount for all **Claims** stated in Item 3. of the Declarations. If the **Insurer** is required or elects to pay the applicable Deductible on behalf of the **Insured**, the **Insured** will pay such Deductible immediately when invoiced.

C.  If different parts of a **Claim** are subject to different Deductibles in different Insuring Agreements the applicable Deductibles will be applied separately to each part of such **Claim** but the sum of such Deductibles shall not exceed the largest applicable Deductible.

## X.   REPORTING

A.  An **Insured** shall provide the **Insurer** with written notice of a **Claim**, **Subpoena**, **Disciplinary Proceeding or Crisis Event** as soon as practicable after the **Insured** becomes aware of a **Claim**, **Subpoena**, **Disciplinary Proceeding** or **Crisis Event** during the **Policy Period** but in no event later than:

1.  Sixty (60) days after the effective date of expiration or termination; or

2.  The expiration date of the Extended Reporting Period, if applicable,

However if the **Insurer** sends written notice to the **Named Insured** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give the **Insurer** written notice of such **Claim**, **Subpoena**, **Disciplinary Proceeding** or **Crisis Event** prior to the effective date of such termination.

B.   If during the **Policy Period**, or an applicable Extended Reporting Period, an **Insured** becomes aware of a **Potential Claim** and gives the **Insurer** notice of such **Potential Claim**, then any **Claim** subsequently arising from such **Potential Claim** shall be deemed made against the **Insured** during the **Policy Period** in which the **Potential Claim** was first reported to, and accepted by, the **Insurer** provided that any such subsequent **Claim** is reported to the **Insurer** in accordance with paragraph A. above.

C.   An **Insured** must give the **Insurer** the assistance, information and cooperation as the **Insurer** may require and shall include in any notice of a **Claim**, or circumstances of a **Potential Claim**, a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature and amount of alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insured** first became aware of the **Claim**, circumstances or alleged **Wrongful Act**.

Notice of a **Claim** or a **Potential Claim**, must be provided in writing to the addresses stated in Item 8. of the Policy Declarations.

## XI.   ALLOCATION

If an **Insured** incurs **Loss** covered by this Policy and loss not covered by this Policy on account of any **Claim** because such **Claim** includes both covered and non-covered matters, coverage with respect to such **Claim** shall apply as follows:

A.   100 percent (100%) of **Defense Expenses** on account of the **Claim** will be considered covered **Loss** provided that this shall not apply to any **Insured** for whom coverage is excluded pursuant to Section XXIV. Representations and Severability; and

B.   The **Insurer** shall fairly allocate all remaining loss that an **Insured** incurred on account of such **Claim** between covered **Loss** and uncovered loss based upon the relative legal exposure of the parties to such matters.

## XII.   OTHER INSURANCE AND INDEMNITY

If other valid and collectible insurance (other than a policy that is issued specifically as excess of this Policy) is available to the **Insured** for **Loss** covered under this Policy or if indemnification from a **Non-Profit Entity** is entitled to an **Insured Individual**, the insurance provided by this Policy shall be excess of such other insurance or indemnification regardless of whether or not such insurance is primary, contributory, excess contingent or whether such indemnification is actually made.

## XIII.   RELATED CLAIMS

All **Related Claims** will be considered as a single **Claim** made in the **Policy Period** or Extended Reporting Period in which the earliest of such **Related Claims** was first made or first deemed to have been made pursuant to this Policy.  All **Related Claims** are subject to the Limits of Liability, Deductible and other terms and conditions applicable to the earliest **Related Claim**.

## XIV.   LEGAL PROCEEDINGS

A.   No individual or entity has a right under this Policy to join the **Insurer** as a party or otherwise bring **Insurer** into a suit asking for damages from an **Insured** or to sue the **Insurer** on this Policy unless all of its terms have been fully complied with.

B. An individual or entity may sue the **Insurer** to recover an agreed settlement or on a final judgment against an **Insured** but the **Insurer** will not be liable for damages that are not payable under the terms of this Policy or that are in excess of the applicable Limit of Liability.  An agreed settlement means a settlement and release of liability signed by **Insurer**, the **Insured** and the claimant or the claimant's legal representative.

**XV.    MATERIAL CHANGE**

A. Merger or Acquisition of Named Insured

If during the **Policy Period**:

1. The **Named Insured** merges with or is acquired by another individual, entity or group of individuals or entities where the **Named Insured** is not the surviving entity; or

2. The **Named Insured** becomes **Financially Impaired**;

this Policy shall continue until the termination or expiration of this **Policy Period** but only for **Claims** for a **Wrongful Act** which occurs prior to such event.

The **Named Insured** shall notify **Insurer** of such transaction as soon as practicable but no later than sixty (60) days after the effective date of the transaction or impairment, and provide such additional information as the **Insurer** requires.

B. Cessation of Insured Entities

If before or during the **Policy Period** an **Insured Entity** ceases to be an **Insured Entity** then coverage for such **Insured Entity** and its **Insured Individuals** shall continue until termination or expiration of this **Policy Period** but only for **Claims** for a **Wrongful Acts** prior to the date such entity ceased to be an **Insured Entity**.

C. Additional Entities or Insured Individuals

If during the **Policy Period**:

1. The number of **Insured Individuals** increases more than fifteen percent (15%) from the number of **Insured Individuals** at the inception of the **Policy Period**;

2. The **Named Insured** forms another entity, acquires a group of individuals, or merges with another entity where the **Named Insured** is the surviving entity;

then coverage for such entity and its **Insured Individuals** shall be provided but only for **Claims** for **Wrongful Acts** on or after the date such entity was formed or acquired.

If, as a result of such formation or acquisition the total revenues of the new entity or acquisition exceeds twenty five percent (25%) of the revenues of the **Named Insured** as of the beginning of the **Policy Period** then coverage for such entity and **Insured Individuals** will end 90 days after the formation of such entity and acquisition of such individuals, or the end of the **Policy Period**, whichever is earlier, unless the **Named Insured** reports such acquisition to the **Insurer** and agrees to any amendments to the terms of this Policy, including but not limited to an additional premium, the **Insurer** may require.

D. If during the **Policy Period** an **Insured Individual,** as a result of loss, suspension, revocation or surrender of the **Insured Individual's** license to practice law, leaves the practice of law;  then coverage for such **Insured Individual** shall be provided under this Policy for **Claims** reported during the **Policy Period** which arise from **Wrongful Acts** that occur prior to the date of the loss, suspension, revocation or surrender of such **Insured Individual's** license.

XVI.   **SUBROGATION**

In the event of any payment under this Policy the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**, and shall do nothing to prejudice or compromise such rights without the **Insurer's** express written consent.

XVII.   **TERRITORY**

This Policy applies anywhere in the world provided that the a **Claim**, **Subpoena** or **Disciplinary Proceeding** is made and brought against the **Insured** within the United States, its territories or possessions or Canada.

XVIII.   **TERMINATION OF POLICY**

This policy will terminate upon:

A.   Twenty (20) days after  written notice of termination is mailed by the **Insurer** based upon nonpayment of premium, unless such premium is paid within such twenty (20) day period;

B.   Receipt by the **Insurer** of written notice of termination from the **Named Insured**;

C.   Expiration of the **Policy Period**; or

D.   A date agreed upon by the **Insurer** and the **Named Insured**.

XIX.   **BANKRUPTCY**

Bankruptcy of an **Insured** shall not relieve the **Insurer** of its obligations under this Policy.

XX.   **VALUATION AND FOREIGN CURRENCY**

All premiums, limits, deductibles, and other amounts are expressed and payable in the currency of the United States of America. If a judgment is rendered, a settlement is denominated or another element of loss this Policy is stated in a currency other than the United States of America dollars, payment under this Policy shall be made in United States of America dollar equivalent determined by the rate of exchange published in the _Wall Street Journal_ on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of loss is due, respectively.

XXI.   **ROLE OF NAMED INSURED**

By accepting this Policy the **Named Insured** agrees that it is authorized to, and will, act on behalf of all **Insureds** with respect to any rights provided under this Policy and each **Insured** agrees that the **Named Insured** shall act on its behalf with respect to all such matters.

XXII.   **TITLES AND HEADINGS**

The titles and headings in this Policy are solely for convenience and form no part of the terms and conditions of coverage.

XXIII.   **CONFORMANCE TO LAW AND TRADE SANCTIONS**

Coverage under this Policy does not apply to the extent trade, economic sanction, insurance or other laws or regulations prohibit the **Insurer** from providing insurance.  The terms of this Policy which are in conflict with the statutes of the state in which this Policy is issued are amended to conform to those statutes.

XXIV.   **REPRESENTATIONS AND SEVERABILITY**

A.   The declarations and statements in the **Application** for this Policy are representations and the **Insurer** has relied on such representations when issuing this Policy.  Such representations are incorporated into and constitute part of this Policy.

1.   The **Application** shall be construed as a separate application by each **Insured**.

2.   No statement in the **Application**, fact pertaining to, or knowledge possessed by any **Insured Individual** shall be imputed to any other **Insured Individual**.

B.   If the **Application** contains any misrepresentations made with the intent to deceive or contains misrepresentations which materially affect the acceptance of the risk or the hazard assumed by the **Insurer** under this Policy, then no coverage shall be afforded for any **Claim** based upon arising from or in consequence of any such misrepresentation with respect to:

1.   Any **Insured Individual** who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations) or any **Insured Entity** to the extent it indemnifies any such **Insured Individual**; or

2.   Any **Insured Entity** if any past or present President, Chief Executive Officer, Chief Financial Officer, Managing Partner  or Chief Information Officer (or any equivalent position) of the **Insured Entity** knew of such misrepresentation (whether or not such individual knew such **Application** contained such misrepresentations).



POLICYHOLDER NOTICE

## U.S. Treasury Department's
## Office of Foreign Assets Control ("OFAC")
## Advisory Notice To Policyholders

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this notice carefully.**

The Office of Foreign Assets Control ("OFAC") administers and enforces sanctions policy, based on Presidential Declarations of National Emergency.

OFAC has identified and listed numerous foreign agents, front organizations, terrorists, terrorists organizations, and narcotic traffickers as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site:  http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated United States sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

Other limitations on the premiums and payments also apply.



POLICYHOLDER NOTICE

## CUSTOMER NOTICE OF PRIVACY POLICY AND PRODUCER COMPENSATION PRACTICES DISCLOSURES—PRIVACY POLICY DISCLOSURE

### *Collection of Information*

We collect personal information so that we may offer quality products and services. This information may include, but is not limited to, name, address, Social Security number, and consumer reports from consumer reporting agencies in connection with your application for insurance or any renewal of insurance. For example, we may access driving records, insurance scores or health information. Our information sources will differ depending on your state and/or the product or service we are providing to you. This information may be collected directly from you and/or from affiliated companies, non-affiliated third parties, consumer reporting agencies, medical providers and third parties such as the Medical Information Bureau.

We, and the third parties we partner with, may track some of the web pages you visit through cookies, pixel tagging or other technologies. We currently do not process or comply with any web browser's "do not track" signals or similar mechanisms that request us to take steps to disable online tracking. For additional information regarding online privacy, please see our online privacy statement, located at www.hanover.com.

### *Disclosure of Information*

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with our insurance company affiliates or with third parties that assist us in processing and servicing your account. We also may share your information with regulatory or law enforcement agencies, reinsurers and others, as permitted or required by law.

Our insurance companies may share information with their affiliates, but will not share information with non-affiliated third parties who would use the information to market products or services to you.

Our standards for disclosure apply to all of our current and former customers.

### *Safeguards to Protect Your Personal Information*

We recognize the need to prevent unauthorized access to the information we collect, including information held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect the confidentiality and integrity of all non-public, personal information, including but not limited to social security numbers, driver's license numbers and other personally identifiable information.

### *Internal Access to Information*

Access to personal, non-public information is limited to those people who need the information to provide our customers with products or services. These people are expected to protect this information from inappropriate access, disclosure and modification.

### *Consumer Reports*

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;

- credit history, driving record (including records of any operators who will be insured under the policy); and/or

- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.



# POLICYHOLDER NOTICE

### _Access to Information_

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances, you may be entitled to a copy at no cost.

You also may review certain information we have about you or your business in our files. To review information we maintain in our files about you or your business, please write to us, providing your complete name, address and policy number(s), and indicating specifically what you would like to see. If you request actual copies of your file, there may be a nominal charge.

We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a record indicating that the information was provided to another party, we will tell you to whom such information is normally disclosed.

There is information that we cannot share with you. This may include information collected in order to evaluate a claim under an insurance policy, when the possibility of a lawsuit exists. It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be properly explained.

### _Correction of Information_

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position. The information in question will be investigated. If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified. However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed. If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect. We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

### _Our Commitment to Privacy_

In the insurance and financial services business, lasting relationships are built upon mutual respect and trust. With that in mind, we will periodically review and revise our privacy policy and procedures to ensure that we remain compliant with all state and federal requirements. If any provision of our privacy policy is found to be non-compliant, then that provision will be modified to reflect the appropriate state or federal requirement. If any modifications are made, all remaining provisions of this privacy policy will remain in effect. For more detailed information about our customer privacy policy (including any applicable state-specific policies) and our online privacy statement, visit our Web site, located at www.hanover.com.

### _Further Information_

If you have questions about our customer privacy policy (including any applicable state-specific policies) or our online privacy statement, or if you would like to request information we have on file, please write to us at our Privacy Office, N435, The Hanover Insurance Group, Inc., 440 Lincoln Street, Worcester, MA 01653. Please provide your complete name, address and policy number(s). A copy of our Producer Compensation Disclosure is also available upon written request addressed to the attention of the Corporate Secretary, N435, The Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653.

## Producer Compensation Disclosure

Our products are sold through independent agents and brokers, often referred to as "Producers." We may pay Producers a fixed commission for placing and renewing business with our company. We may also pay additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us. Details of our Producer compensation practices may be found at www.hanover.com.



POLICYHOLDER NOTICE

This notice is being provided on behalf of the following Hanover Companies: The Hanover Insurance Group, Inc. - Allmerica Financial Alliance Insurance Company - Allmerica Financial Benefit Insurance Company - Allmerica Plus Insurance Agency, Inc. - Citizens Insurance Company of America - Citizens Insurance Company of Illinois - Citizens Insurance Company of the Midwest - Citizens Insurance Company of Ohio - Citizens Management, Inc. - AIX Ins. Services of California, Inc.- Campania Insurance Agency Co. Inc. - Campmed Casualty & Indemnity Co. Inc. - Chaucer Syndicates Limited- Educators Insurance Agency, Inc.- Hanover Specialty Insurance Brokers, Inc. - The Hanover American Insurance Company - The Hanover Insurance Company - The Hanover New Jersey Insurance Company - The Hanover National Insurance Company - Hanover Lloyd's Insurance Company - Massachusetts Bay Insurance Company - Opus Investment Management, Inc. - Professionals Direct Insurance Services, Inc. -Professional Underwriters Agency, Inc. - Verlan Fire Insurance Company - Nova Casualty Company - AIX Specialty Insurance Company.

 POLICYHOLDER NOTICE

# CLAIM REPORTING GUIDELINES

At Hanover Professionals, we are committed to providing timely and efficient claims assistance to our Insureds. Please follow these guidelines to help us help you.

**Notice of a Claim**

Report a claim to Hanover Professionals by email, facsimile or online as soon as possible to provide timely notice as required by your Hanover Policy. Contact us at:

| **Phone: 800.628.0250 (ext. 8556281)   Fax: 508.926.4789** |
| --- |

You may also email us directly at lawyerclaim@hanover.com or online at www.hanover.com/hpro/pli.

**Claims Requiring Expedited Handling**

Some claims are time sensitive. Please report such claims as soon as you become aware of them, and while allowing sufficient time for the carrier to investigate and meaningfully respond. Do not wait until the eve of the response deadline as it threatens our ability to timely respond. Those items include, but are not limited to:

You have been served with a summons and complaint

✓ You received a demand from a Claimant which expires on a date certain

✓ You received notice of a proceeding requiring an immediate answer or an answer within a limited timeframe

**Correspondence We Need From You**

Please provide a written narrative of the circumstances surrounding the claim or potential claim. The narrative should include:

✓ The Named Insured

✓ The Insureds (i.e., the lawyers involved in the professional services issue), your policy number, and effective date of coverage

✓ The client (Claimant's) name, address, and telephone number (also include the name, address, and telephone number of the Claimant's attorney)

✓ The timeframe in which you provided professional services to the Claimant

✓ Whether your relationship with the Claimant is ongoing or has been terminated

✓ A brief summary of the services rendered

✓ The date the error (alleged error) occurred

✓ A brief summary of the alleged (potential) error -  please include the date you first became aware of the claim and the potential amount of damages that will be sought

✓ All pertinent letters or documents necessary for us to properly evaluate the claim (if there are numerous documents, please note this and provide those most pertinent)



POLICYHOLDER NOTICE

# INFORMATION REGARDING
# EXTENDED REPORTING PERIOD ENDORSEMENT
# ("TAIL COVERAGE")

The enclosed policy provides coverage for claims reported during the policy period.  Subject to the policy's terms and conditions, your firm and/or each of the individual firm members may purchase an Extended Reporting Period Endorsement, also known as "tail coverage", that will extend the time for reporting claims arising out of professional services rendered while the policy was still in effect although the policy may have been cancelled or non-renewed, or when a firm member leaves the firm or the practice of law.

The premium charged for the endorsement is expressed as a factor of your policy's annual premium.

| Length of "Tail Coverage" Offered | "Tail Coverage" Premium |
|---|---|
| 12 months coverage | 1.00 of last annual premium |
| 24 months coverage | 1.50 of last annual premium |
| 36 months coverage | 1.75 of last annual premium |
| 60 months coverage | 2.00 of last annual premium |
| 84 months coverage | 2.50 of last annual premium |
| Unlimited coverage | 3.00 of last annual premium |

*Extended Reporting Period Endorsements may be subject to state regulatory requirements.*

Please contact your agent or customer service representative for pricing specific to your situation and location.



Endorsement

---

Coverage: Lawyers Professional Liability

Endorsement Number: 1

Issued To: DC Capital Law

Policy Number: LHY-D795443-00

Issued By: The Hanover Insurance Company

Effective Date: 12/21/2018

---

# SCHEDULE OF FORMS

To be attached to and form part of the Policy Number listed above.

| | |
|---|---|
| 913-1901 05/18 | Lawyers Advantage Professional Liability RPG Declarations |
| 913-1001 Index 02/17 | Lawyers Advantage Professional Liability Policy Index |
| 913-1001 02/17 | Lawyers Advantage Professional Liability Policy |
| 913-1800 PHN 01/16 | U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders |
| 913-1801 PHN 01/16 | Customer Notice of Privacy Policy and Producer Compensation Practices Disclosures - Privacy Policy Disclosure |
| 913-1817 PHN 01/16 | Claim Reporting Guidelines |
| 913-1818 PHN 01/16 | Information Regarding Extended Reporting Period Endorsement ("Tail Coverage") |
| 913-1011 01/16 | Schedule of Forms |
| 913-1014 01/16 | Excluded Entity |
| 913-1103DC 01/16 | Pre-Claim Assistance Coverage (District of Columbia) |
| 913-1621 01/16 | District of Columbia State Amendatory Endorsement |
| 913-1902 05/18 | USI Affinity Lawyers Liability |

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

---



Endorsement

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 1 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

# EXCLUDED ENTITY

In consideration of the premium charged it is agreed that:

The following entities are excluded from coverage under this Policy.

<u>Entity(ies)</u>

Newton Group

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



# Endorsement

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 2 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

## PRE-CLAIM ASSISTANCE COVERAGE (DISTRICT OF COLUMBIA)

In consideration of the premium charged it is agreed that:

A.  Item 3.A. Insuring Agreements of the Declarations is amended to include:

| | | |
|---|---|---|
| Pre-Claim Assistance Sublimit | $1,000,000 each **Claim** not to exceed; | **$10,000** each **Claim** |
| | $1,000,000   Maximum Aggregate | |

B.  Section I.A. Insuring Agreements is amended to include:

Pre-Claim Assistance

The **Insurer**, at its discretion will reimburse the **Insured** for **Pre-Claim Expenses** arising out of a **Potential Claim** first reported to the **Insurer** during the **Policy Period** until the date a **Claim** arising out of such **Potential Claim** is first made against the **Insured**.

C.  Section III. Definitions is amended to include:

**Pre-Claim Expense** means costs or expenses incurred by the **Insurer** at its discretion to investigate a **Potential Claim**.

D.  Section VIII. Limit of Liability is amended to include:

**Pre-Claim Expenses** are part of and not in addition to the **Professional Services** Limits of Liability.

E.  Section IX.A. Deductible is deleted and replaced by:

The **Insurer's** liability under this Policy applies only to that part of covered **Loss**, **Subpoena Response Expenses**, **Disciplinary Proceedings Expenses**, **Crisis Event Expenses** or **Pre-Claim Expenses** which is in excess of the applicable Deductible for each **Claim**, **Disciplinary Proceeding**, appearances **Crisis Event** or **Pre-Claim Expense** stated in Item 3. of the Declarations.  Such Deductible shall be borne by the **Insured's** uninsured and at their own risk.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



Endorsement

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 3 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

## DISTRICT OF COLUMBIA STATE AMENDATORY ENDORSEMENT

In consideration of the premium charged it is agreed that:

A.  Section III.E. of the definition of **Crisis Event** is amended to delete the word "sole."

B.  Section XVIII. Termination of Policy is deleted and replaced by:

**XVIII.  TERMINATION OF POLICY**

A.  This Policy will terminate upon:

1.  Thirty (30) days after the **Insurer** mails written notice of termination to the **Named Insured**, based upon any reason if this Policy has been in effect for thirty (30) days or less and is not a renewal of a policy issued by the **Insurer**;

2.  Thirty (30) days after the **Insurer** mails written notice of termination to the **Named Insured**, for only one or more of the following reasons if this Policy has been in effect for thirty (30) days or more, or is a renewal of a policy issued by the **Insurer**:

a.  The **Insured** has refused or failed to pay a premium due under the terms of the Policy;

b.  The **Insured** has made a material and willful misstatement or omission of fact to the **Insurer** or its employees, agents or brokers in connection with any application to or **Claim** against the **Insurer**;

c.  The property or other interest of the **Insured** shall have been transferred to a person other than the **Insured** or beneficiary, unless the transfer is permissible under the terms of the Policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

3.  Receipt by the **Insurer** of written notice of termination from the **Named Insured**;

4.  Expiration of the **Policy Period**; or

5.  A date agreed upon by the **Insurer** and the **Named Insured**.

B.  This Policy may be non-renewed by the **Insurer** by sending written notice to the **Named Insured** not less than thirty (30) days prior to the expiration of the **Policy Period**.

C.  Notice of termination or nonrenewal will be mailed to the **Named Insured** by first class mail to the last mailing address known to the **Insurer**, with a statement of the specific reasons for termination.  A copy of such notice will be sent to the agent of record at least five (5) days before mailing of the notice to the **Insured**.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



**Risk Purchasing Group Endorsement**

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

## USI AFFINITY LAWYERS LIABILITY

In consideration of the premium charged it is agreed that:

A.   Section I. Insuring Agreements is amended to include:

E.   <u>Breach Event Expenses and Cyber Investigation Expenses</u>

The **Insurer** will pay on behalf of the **Insured**, **Breach Event Expenses** directly resulting from a **Privacy Breach** or **Security Breach**, and **Cyber Investigation Expenses** directly resulting from a **Regulatory Investigation** regarding a **Privacy Breach** or **Security Breach**, in the rendering or failure to render **Professional Services**, first discovered by the **Insured** during the **Policy Period**, provided that:

1.   The **Privacy Breach** or **Security Breach** must have first occurred on or after the applicable Retroactive Date(s);

2.   The **Insured** had no knowledge of the **Privacy Breach** or **Security Breach** or facts which could have reasonably caused such **Insured** to foresee the **Privacy Breach** or **Security Breach**, prior to the effective date of this Policy; and

3.   The **Privacy Breach** or **Security Breach** is reported to the **Insurer** pursuant to Section X. Reporting.

F.   <u>Reputation Protection Expense</u>

The **Insurer** will reimburse the **Insured** up to fifty (50%) percent of **Reputation Event Expenses** the **Insured** incurs responding to a **Reputation Event** in the rendering or failure to render **Professional Services**, provided that:

1.   The **Reputation Event** must have first occurred on or after the applicable Retroactive Date(s);

2.   The **Insured** had no knowledge of the **Reputation Event** or facts which could have reasonably caused such **Insured** to foresee the **Reputation Event**, prior to the effective date of this Policy; and

3.   The **Reputation Event** is reported to the **Insurer** pursuant to Section X. Reporting.

G.   <u>Withheld Client Fee Assistance</u>

If the **Insured** attempts to collect a fee due for **Professional Services** that the **Insured's** client has refused to pay for more than three (3) months from the time payment was due ("Withheld Client Fee") and:

1.   As a result of such collection attempts, the client brings an otherwise covered **Claim** during the **Policy Period** alleging a **Wrongful Act** in the rendering or failure to render **Professional Services** for an amount greater than owed to the **Named Insured**; and

2.   The **Professional Services** were rendered under a fully executed engagement letter with the client, which includes fee arrangements and outlines the scope of representation; and

3.   The **Insured** provides the **Insurer** written confirmation from the client, acceptable to the **Insurer**, that the client will withdraw the **Claim** ("written confirmation");

then the **Insurer** will reimburse one hundred percent (100%) of the Withheld Client Fee.



Risk Purchasing Group Endorsement

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

B.   Section II. D. Non-Practicing Extended Reporting Period is amended to include:

For purposes of determining eligibility for the Non-Practicing Extended Reporting Period, full years continuously insured with the USI Affinity Insurance Program shall be considered years with the **Insurer**.

C.   Section III. Definitions is amended to include:

**Breach Event Expenses** means the reasonable and necessary expenses incurred for a stipulated period of time, from the date a **Security Breach** or **Privacy Breach** is first discovered by an **Insured**:

A.   To conduct an investigation and forensic analysis to determine the cause of a covered **Security Breach** or **Privacy Breach**;

B.   To determine and notify the individuals whose **Confidential Records** were accessed or acquired including, but not limited to, the cost of mailing, printing, advertising and other communications;

C.   To establish a call center to be used by individuals whose **Confidential Records** were accessed or acquired;

D.   For credit or identity monitoring or identity theft education assistance including fees, costs or expenses associated with the purchase of an identity fraud insurance policy to benefit individuals whose **Confidential Records** were accessed or acquired;

E.   To retain a public relations crisis management or law firm as consultants to minimize harm directly arising from a covered **Security Breach** or **Privacy Breach**; or

F.   For any other expenses or services pre-approved in writing by the **Insurer** at the **Insurer's** sole and absolute discretion.

**Crisis Management Firm** means a service provider hired by the **Named Insured** and approved in writing by the **Insurer**.  The **Insurer's** consent will not be unreasonably withheld.

**Cyber Investigation Expenses** means all expenses the **Insurer** incurs or authorizes in writing for the investigation, adjustment, defense or appeal of a **Regulatory Investigation**.

**Mediation** means the non-binding intervention of a qualified neutral third party chosen by the **Named Insured**, with agreement by the **Insurer,** and the other party to a **Claim**.

**Regulatory Investigation** means a formal request for information, civil investigative demand or civil proceeding, including requests for information related thereto, brought by, or on behalf of, a state Attorney General, the Federal Trade Commission, the Federal Communications Commission or any other federal, state, local or foreign governmental agency.

**Reputation Event** means a **Wrongful Act(s)** that the **Named Insured** reasonably believes will have material, adverse impact on the **Named Insured's** reputation resulting in a loss of revenues because of diminished customer confidence based on unfavorable information made available by or appearing on:

A.   Social media;

B.   Television or radio broadcasts; or

C.   Newspapers;

provided such written media was in general circulation and such electronic media was available to the public on a fully open network that was neither password protected nor restricted from access by any method.

**Reputation Event Expenses** means the reasonable fees, costs, and expenses incurred by the **Named Insured**



**Risk Purchasing Group Endorsement**

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

for consulting services performed by a **Crisis Management Firm**, as a result of a **Reputation Event**.

D. Section IV. Exclusions is amended to include:

Exclusions Applicable to Breach Event Expenses and Cyber Investigation Expenses above:

This insurance does not apply to **Loss** for any **Claim**, or for any **Breach Event Expenses** or **Cyber Investigation Expenses**:

A. Prior Notice

Based upon, arising out of or in any way related to any **Security Breach**, **Privacy Breach**, investigation, proceeding, act, event, transaction, decision, fact, circumstance or situation which has been the subject of any notice given to any other insurer under any similar policy of which this Policy is a direct or indirect renewal or replacement.

B. Retroactive Date

Based upon, arising out of or in any way related to any **Security Breach**, **Privacy Breach**, investigation, proceeding, act, event, result, damage, transaction, decision, fact, circumstance or situation which occurred, in whole or in part, prior to the applicable Retroactive Date set forth in Item 4. of the Declarations Page.

C. Assumed Obligations

Costs or expenses incurred to perform any obligation assumed by, on behalf of, or with the consent of any **Insured**; however, this Exclusion shall not apply to **Breach Event Expenses**.

D. Return of Payments

Return of fees, charges, commissions or other compensation paid to an **Insured**.

E. Investigations

Costs, fees or expenses incurred or paid by any **Insured** in establishing the existence of, or amount of loss, however this Exclusion shall not apply to **Breach Event Expenses** for the retention of an information security forensic investigator or forensic accountant.

F. System Changes

Costs or expenses incurred to replace, upgrade, update, improve, or maintain any **System**.

G. Non-monetary Relief

Costs of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief.

H. Taxes, Fines and Penalties

Fines or penalties imposed by law, taxes or liquidated damages.

I. Potential Income

Potential income, including interest or dividends, not realized by any **Insured**.



**Risk Purchasing Group Endorsement**

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

    J.   <u>Uniform Commercial Code</u>

       Loss, costs or expenses any **Insured** agrees to incur or incurs on behalf of another natural person or entity when such **Insured** is not obligated to incur such loss, costs or expenses under the Uniform Commercial Code or any other law, statute, rule or code anywhere in the world, including the rules or codes of any clearing or similar entity, provided that this Exclusion does not apply to Insuring Agreement Breach Event Expenses.

    K.   <u>Consequential Loss</u>

       Loss, costs or expenses based upon, arising from or in consequence of an indirect or consequential loss of any nature.

    L.   <u>Malfunction or Error</u>

       Loss, costs or expenses resulting from mechanical failure, faulty construction, error in design, latent defect, wear or tear, gradual deterioration, electrical disturbance, **Media** failure or breakdown or any malfunction or error in programming, or error or omission in processing.

E.  Section VII. Defense and Settlement of Claims, paragraphs. A. and E. are deleted and replaced by:

    A.  The **Insurer** shall have the exclusive right and duty to defend any **Claim** covered by this Policy even if any allegation of such **Claim** is groundless, false or fraudulent.  However, if an **Insured** is entitled under applicable law to select defense counsel, then such defense counsel shall comply with the **Insurer's** customary rates and litigation guidelines regarding billing, staffing and reporting.  The **Insured** may recommend counsel to the **Insurer** and such acceptance will not be unreasonably withheld, provided such counsel agrees with the **Insurer's** customary rates and litigation guidelines regarding billing, staffing and reporting.  The **Insurer** has no duty to defend any **Claim** or pay **Defense Expenses** for **Claims** to which this insurance does not apply.

    E.  The **Insurer** may make any investigation it deems necessary and settle any **Claim** subject to the **Named Insured's** written consent to settle which shall not be unreasonably withheld.  The **Insurer's** duty to defend any **Claim** or pay any amount as **Damages**, **Claim Expenses**, **Subpoena Response Expenses**, **Disciplinary Proceedings Expenses**, loss of earning, **Crisis Event Expenses**, Withheld Client Fee and **Reputation Protection Expenses** will cease when the **Insurer's** applicable Limit of Liability has been exhausted.  Upon exhaustion of the applicable Limit of Liability, the **Insurer** will tender control of the defense to the **Named Insured**.  The **Named Insured** agrees to accept this tender of defense.

F.  Section VIII. Limit of Liability, paragraph F. is deleted and replaced by:

    F.  **Disciplinary Proceeding Expenses**, **Crisis Event Expenses**, **Breach Event Expenses**, **Cyber** I**nvestigation Expenses**, **Reputation Protection Expenses**, Withheld Client Fee and loss of earnings are in addition to, and not part of, the **Professional Services** Limit of Liability.

G.  Section VIII. Limit of Liability is amended to include:

    Regardless of the number of **Insureds**, **Claims**, or claimants, the **Insurer's** liability under this Policy is limited as follows:

    G.  The applicable Limit of Liability for each **Breach Event Expense** or **Cyber Investigation** shown in Item 3 E. of the Declarations is the **Insurer's** maximum liability for all **Breach Event Expenses** and **Cyber Investigations** arising from a single **Privacy Breach** or **Security Breach**.  The applicable Maximum Aggregate Limit of Liability shown in the Policy Declarations is the **Insurer's** maximum liability for all **Breach**



Risk Purchasing Group Endorsement

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

**Event Expenses** and all **Cyber Investigations** arising from all **Privacy Breaches** or **Security Breaches** during the **Policy Period**.

H.   The applicable Limit of Liability for each **Reputation Protection Expense** shown in Item 3.F. of the Policy Declarations is the **Insurer's** maximum liability for all **Reputation Event Expenses** arising from a single **Reputation Event**.  The applicable Maximum Aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all **Reputation Event Expenses** arising from **Reputations Events** during the **Policy Period**.

I.   The applicable Limit of Liability for each Withheld Client Fee Assistance shown in Item 3.G. of the Policy Declarations is **Insurer's** maximum liability for all Withheld Client Fees arising from a single **Claim**.  The applicable Maximum Aggregate Limit of Liability shown in the Declarations is the **Insurer's** maximum liability for all Withheld Client Assistance arising from all **Claims** during the **Policy Period**.

H.   Section IX. Deductible, paragraph A. is deleted and replaced by:

The **Insurer's** liability under this Policy applies only to that part of covered **Loss**, **Subpoena Response Expenses**, **Disciplinary Proceedings Expenses**, **Crisis Event Expenses**, **Breach Event Expenses**, **Cyber Investigation Expenses** or **Reputation Protection Expenses** which is in excess of the applicable Deductible for each **Claim**, **Subpoena**, **Disciplinary Proceeding**, **Crisis Event**, **Privacy Event or Security Breach**, **Regulatory Investigation** or **Reputation Event** stated in Item 3. of the Policy Declarations. Such Deductible shall be borne by the **Insureds** uninsured and at their own risk.

I.   Section IX. Deductible is amended to include:

D.   <u>Deductible Reduction Benefit</u>

1.   <u>Claim-Free</u>

The **Insured** will be entitled to reduction in the each **Claim** Deductible provided that the following qualifications are met:

a.   The **Insurer** has issued a Policy to the **Named Insured** for a minimum of three (3) consecutive annual **Policy Periods**;

b.   The **Policy** must be account current with no overdue payments outstanding; and

c.   The **Named Insured** has not reported any **Claims** in the last three **Policy Periods**.  For purposes of determining eligibility for the Claim-Free benefit full years continuously insured with the USI Affinity Insurance Program shall be considered years with the **Insurer**.

d.   Then the each **Claim** Deductible obligation will be reduced by fifty percent (50%) provided that:

1)   The maximum amount of any such reduction is $10,000.

2)   A Deductible reduction will not be applied:

a.   To any subsequent **Claims** in the **Policy Period**.

b.   If the Policy is cancelled, terminated, non-renewed or subject to an Extended Reporting Period.



**Risk Purchasing Group Endorsement**

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

2. <u>Mediation</u>

   If the **Insurer** asks, and the **Named Insured** agrees, to use **Mediation** to resolve any **Claim** brought against the **Insured**, and if the **Claim** is resolved by **Mediation** within 180 days of the date such **Claim** was reported to the **Insurer** in accordance with Section X. Reporting, the Deductible obligation for that **Claim** will be reduced by fifty percent (50%). The maximum amount of any such reduction is $10,000.

3. <u>Risk Management</u>

   Upon written notice of a **Claim** or **Potential Claim**, if the **Named Insured** provides the **Insurer** with the relevant fully executed engagement letter, which includes fee arrangements and outlines the scope of representation, dated prior to such **Claim** or **Potential Claim** and contains at least two of the following provisions:

   a. An enforceable waiver of damages provision in the **Insured's** favor;

   b. An enforceable limitation of liability limiting the **Insured's** liability to the lesser of the **Insured's** fee or $250,000; provided that this benefit shall not apply if the Policy's Per **Claim** Limit of Liability is $500,000 or less; and

   c. A requirement for mandatory Mediation as the first method of dispute resolution.

      The Deductible obligation for that **Claim** will be reduced by fifty percent (50%), subject to a maximum of $25,000 (Per **Claim**).

4. The reductions provided under D. 1, 2 and 3 of this section cannot be combined.  Only one reduction in Deductible obligation may be applied to a single **Claim**.

J.  Section X. Reporting, paragraph A. is deleted and replaced by:

A.  An **Insured** shall provide the **Insurer** with written notice of a **Claim** as soon as practicable after the **Insured** becomes aware of a **Claim** during the **Policy Period** but in no event later than:

1. Sixty (60) days after the effective date of expiration or termination of the Policy; or

2. The expiration date of the Extended Reporting Period, if applicable,

   However if the **Insurer** sends written notice to the **Named Insured** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give the **Insurer** written notice of such **Claim** prior to the effective date of such termination.

   An **Insured** shall provide the **Insurer** with written notice of a **Reputation Event**, **Subpoena**, **Disciplinary Proceeding**, **Crisis Event**, **Privacy Breach** or **Security Breach**, or **Regulatory Investigation** as soon as practicable after the **Insured** becomes aware of the **Reputation Event**, **Subpoena**, **Disciplinary Proceeding**, **Crisis Event**, **Privacy Breach** or **Security Breach**, or **Regulatory Investigation**, during the **Policy Period**, but in no event later than the effective date of expiration or termination of the Policy.

K.  Section X. Reporting is amended to include:

The **Insured** must give the **Insurer** the assistance, information and cooperation as the **Insurer** may require and shall include:

1. In any notice of a **Security Breach** or **Privacy Breach**, the nature of the alleged **Privacy Breach** or **Security Breach**, the amount or scope of alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insured** first became aware of the **Privacy Breach** or **Security**



Risk Purchasing Group Endorsement

| | |
|---|---|
| Coverage: Lawyers Professional Liability | Endorsement Number: 4 |
| Issued To: DC Capital Law | Policy Number: LHY-D795443-00 |
| Issued By: The Hanover Insurance Company | Effective Date: 12/21/2018 |

**Breach**.

2. In any notice of a **Regulatory Investigation**, the regulatory complaint, the nature of the alleged **Privacy Breach** or **Security Breach**, the names of actual or potential claimants, and the manner in which the **Insured** first became aware of the **Privacy Breach** or **Security Breach**;

3. In any notice of a **Crisis Event**, the nature of the alleged **Wrongful Act** or other event, the nature of the anticipated material, adverse impact on the **Named Insured's** reputation, and the manner in which the **Insured** first became aware of the circumstances or alleged **Wrongful Act**; and

4. In any notice of a **Reputation Event**, the nature of the alleged **Wrongful Act**, the nature of the anticipated material, adverse impact on the **Named Insured's** reputation, and the manner in which the **Insured** first became aware of the circumstances or alleged **Wrongful Act**.

5. Notice of a **Reputation Event**, **Subpoena**, **Disciplinary Proceeding**, **Crisis Event**, **Privacy Breach** or **Security Breach**, or **Regulatory Investigation**, must be provided in writing to the addresses stated in Item 7. of the Policy Declarations.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
Fort Pierce Division
CASE NO.: 9:18-CV-80311-ROSENBERG/REINHART

DIAMOND RESORTS U.S. COLLECTION
DEVELOPMENT, LLC, a Delaware limited
liability company; and DIAMOND RESORTS
HAWAII COLLECTION DEVELOPMENT,
LLC, a Delaware limited company,

       Plaintiffs,

v.

US CONSUMER ATTORNEYS, P.A., a
Florida professional corporation; HENRY
PORTNER, ESQ. an individual; ROBERT
SUSSMAN, an individual; PLUTO
MARKETING INC., a Nevada corporation;
1PLANETMEDIA INC, a Nevada corporation;
NEWTON GROUP TRANSFERS, LLC, a
Michigan limited liability company; THE
NEWTON GROUP, ESA LLC, a Michigan
limited liability company; INTERVAL
BROKER DIRECT, LLC, a Michigan limited
liability company; NEWTON GROUP EXIT,
LLC, a Florida limited liability company; and
DC CAPITAL LAW FIRM, LLP, a Washington
D.C. limited liability partnership,

       Defendants.

## THIRD AMENDED COMPLAINT

    Plaintiffs, Diamond Resorts U.S. Collection Development, LLC ("**US Collection**

**Development**") and Diamond Resorts Hawaii Collection Development, LLC ("**Hawaii Collection**

**Development**") (collectively, "**Plaintiffs**"), sue Defendants, US Consumer Attorneys, P.A.

("**USCA**"); Henry Portner, Esq. ("**Portner**"); Robert Sussman ("**Sussman**"); Pluto Marketing Inc.

("**Pluto**"); 1Planetmedia Inc. ("**1 Planet**") (USCA, Portner, Sussman, Pluto, and 1 Planet may

sometimes hereinafter be collectively referred to as the "**USCA Defendants**"); Newton Group

Transfers, LLC ("**Newton Group**"); The Newton Group, ESA LLC ("**Newton ESA**"); Interval Broker Direct, LLC ("**IBD**"); Newton Group Exit, LLC ("**Newton Exit**") (Newton Group, Newton ESA, IBD, and Newton Exit may sometimes hereinafter be collectively referred to as the "**Newton Defendants**"); and DC Capital Law Firm, LLP ("**DC Capital**") (the USCA Defendants, the Newton Defendants, and DC Capital may sometimes be collectively referred to as the "**Defendants**"), and allege as follows:

<u>**Parties, Subject Matter and Personal Jurisdiction, and Venue**</u>

1.      Plaintiff, US Collection Development, is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business located at 10600 West Charleston Blvd., Las Vegas, Nevada.  US Collection Development is a person or entity engaged in commerce within the control of Congress.  The sole member of US Collection Development is Diamond Resorts Developer and Sales Holding Company, a Delaware corporation with its principal place of business at 10600 West Charleston Blvd., Las Vegas, Nevada.  US Collection Development is a resident of either Delaware or Nevada.

2.      Plaintiff, Hawaii Collection Development, is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business located at 10600 West Charleston Blvd., Las Vegas, Nevada.  Hawaii Collection Development is a person or entity engaged in commerce within the control of Congress.  The sole member of Hawaii Collection Development is Diamond Resorts Developer and Sales Holding Company, a Delaware corporation with its principal place of business at 10600 West Charleston Blvd., Las Vegas, Nevada.  Hawaii Collection Development is a resident of either Delaware or Nevada.

3.      Defendant, USCA, is a professional corporation organized and existing under the laws of the state of Florida with an alleged principal place of business Lake Worth, Palm Beach

County, Florida. However, upon information and belief, USCA's main office is located at 1300 North Johnson Avenue, Suite 107, El Cajon, California 92020, which is the same office as co-Defendants, Pluto and 1 Planet. USCA is an entity engaged in commerce within the control of Congress.

4.     Defendant, Portner, is an individual and an attorney licensed to practice law in multiple jurisdictions, including Florida and California. Portner purports to be the principal and sole law partner of USCA. Portner resides in Lake Worth, Palm Beach County, Florida, but he also spends significant time in California. Portner is a person engaged in commerce within the control of Congress.

5.     Defendant, Sussman, who passed away on April 16, 2019, resided in Nevada or California at the time he passed away. Prior to his death, Sussman held himself out as the manager of USCA and he directed the operations of USCA, Pluto and 1 Planet. Sussman was a person engaged in commerce within the control of Congress.

6.     Defendant, Pluto, is a corporation organized and existing under the laws of the state of Nevada with an alleged principal place of business in Las Vegas, Nevada. However, upon information and belief, Pluto's main office is located at 1300 North Johnson Avenue, Suite 107, El Cajon, California 92020 in the same office as co-Defendants, USCA and 1 Planet. Pluto is an entity engaged in commerce within the control of Congress.

7.     Defendant, 1 Planet, is a corporation organized and existing under the laws of the state of Nevada with an alleged principal place of business in Las Vegas, Nevada. However, upon information and belief, 1 Planet's main office is located at 1300 North Johnson Avenue, Suite 107, El Cajon, California 92020 in the same office as co-Defendants, Pluto and USCA. 1 Planet is an entity engaged in commerce within the control of Congress.

8. Defendant, Newton Group, is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal address located at 250 Monroe Avenue NW, Suite 400 PMB #6026, Grand Rapids, Michigan 49503. However, upon information and belief, Newton Group operates out of facilities located at 1750 E Northrop Boulevard, Suite 170, Chandler, Arizona 85286. Newton Group is an entity engaged in commerce within the control of Congress.

9. Defendant, Newton ESA, is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal place of business located at 3148 Plainfield Avenue NE, Suite 283, Grand Rapids, Michigan 49525. Newton ESA is an entity engaged in commerce within the control of Congress.

10. Defendant, IBD, is a limited liability company organized and existing under the laws of the state of Michigan with a principal place of business located at 250 Monroe Avenue NW, Suite 400 PMB #6026, Grand Rapids, Michigan 49503. IBD is an entity engaged in commerce within the control of Congress.

11. Defendant, Newton Exit, is a limited liability company organized and existing under the laws of the state of Florida, which according to the Florida Secretary of State, has a principal address located at 218C East New York Avenue, Deland, Florida 32724, but this address appears to be fake as it is occupied by CHA, an accounting firm. Upon information and belief, Newton Exit can be found via its manager, UNL Holdings, LLC, which is affiliated with the other Newton Defendants and can be found at the same location as Newton ESA: 3148 Plainfield Avenue NE, Suite 283, Grand Rapids, Michigan 49525. Newton Exit is an entity engaged in commerce within the control of Congress.

12.     Defendant, DC Capital, is a limited liability partnership organized and existing under the laws of the District of Columbia, with a principal address located at 700 12th Street NW, Suite 700, Washington, D.C. 20005.  DC Capital is an entity engaged in commerce within the control of Congress.

13.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 as many of the Defendants are located in this District or the actions and inactions that serve as the basis for the claims stated herein occurred in, or were directed in or from, the Southern District of Florida and/or Defendants repeatedly used the mails and wires to solicit consumers in the state of Florida and direct false demand letters and other correspondence to Diamond (as defined below) and the consuming public in Florida.

14.     This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. §§ 1331 and 1338(a) with respect to the causes of action arising under the Lanham Act.  The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367, as the state law claims are so related to claims in this civil action within the Court's original jurisdiction that they form part of the same case or controversy and same common core of operative facts.

### Diamond Resorts™

15.     Diamond Resorts International, Inc. d/b/a Diamond Resorts™[1] ("**DRI**," "**Diamond**" or "**Diamond Resorts**"), with more than 420 branded and affiliated resorts in the United States, Canada, Mexico, the Caribbean, Europe, Asia, Australia, and Africa, is a global leader in the hospitality and vacation ownership industry.

---

[1] Plaintiffs also conduct business under the trade name "Diamond Resorts."

16. Diamond Resorts strives to provide innovative and flexible vacation experiences for its owners, members, and guests to ensure that they create their dream vacation experiences.

17. DRI, through its various indirect subsidiaries, owns, operates and manages timeshare resorts and, through resort and partner affiliations, provides members with access to timeshare resorts, cruises, excursions, and vacations experiences that are unrivaled in the hospitality industry.

18. As part of their different vacation ownership options, Diamond Resorts offers its owners and members the ability to reserve and use vacation interests at different resorts by using "points" to stay at various resorts within different multi-site timeshare plans, more commonly known as "Collections." For example, the "US Collection" is a member-friendly, flexible, points-based program that allows members of the US Collection to stay at a variety of destinations primarily throughout the United States, including in Florida. The "Hawaii Collection" offers similar flexibility to its members for resorts primarily located in Hawaii, Nevada and Arizona.

19. To become members of the US Collection and to have the benefits of being a member, including the ability to reserve and enjoy accommodations with the US Collection, consumers (the "**Diamond Owners**") enter into valid and legally binding contracts wherein they purchase and finance memberships from US Collection Development (the "**Timeshare Contracts**"). The Timeshare Contracts, unless the Diamond Owner pays the purchase price in full at the time of purchase, typically contain financing provisions wherein the Diamond Owner makes an upfront payment to acquire the desired amount of points and then finances the remaining amounts due for the points through US Collection Development. US Collection Development earns a profit from the sale and, as with other lenders, earns revenue from the financed portion of the purchase. The Timeshare Contracts also identify that Diamond Owners are obligated to pay

annual assessments, which are also known as maintenance fees.  Commonly, Diamond Owners who own points in the US Collection subsequently purchase additional points in the US Collection, which leads to additional sales and financing revenues for US Collection Development.  The same is true for the Hawaii Collection Development.

20.     Plaintiffs, as the parties pursuing this action, are concerned not only for their own revenues realized from sales and financing, and for their reputations, but for the well-being of Diamond Owners who have been defrauded by Defendants' wrongful conduct as alleged herein.

21.     Plaintiffs have instituted this action and are pursuing claims against Defendants to redress the Defendants' illegal actions through monetary damages and declaratory and injunctive relief.  Plaintiffs also seek to deter future wrongful conduct against Diamond and Diamond Owners by seeking disgorgement of the profits improperly earned by Defendants to date.

22.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

23.     Plaintiffs have retained the services of the undersigned lawyers to represent them in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 35 U.S.C. § 1117 and other statutes, as set forth in greater detail herein.

### **Defendants and the Timeshare Exit Industry Generally**

24.     Diamond has over 480,000 members, and the overwhelming majority of those members are extremely satisfied with their vacations and relationships with Diamond Resorts, including Plaintiffs.

25.     However, within the last ten years, a nefarious cottage industry known as "timeshare exit" has sprouted.  This industry preys upon unsuspecting timeshare owners through, in part, the use of false and misleading advertising designed to encourage timeshare owners to

relinquish ownership of their timeshare interests.  Diamond Owners are not immune from the improper efforts of these timeshare exit companies and their deceptive practices and strategies, including those of Defendants in this action.  In some cases, the advertising itself advises the Diamond Owners to breach or default on their obligations under the Timeshare Contracts.  And, in other cases, once the false and misleading advertising lures the unsuspecting Diamond Owners to connect with the exit company (or its advertising companion), such as Defendants, the Diamond Owners are encouraged – if not specifically told – to breach their obligations under the Timeshare Contract.  As a result, this scheme causes substantial harm to Plaintiffs' sales, reputations, and future business prospects.

26.    Timeshare exit businesses, which include Defendants, typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with damaged or ruined credit arising from nonpayment of their legal obligations.  Certainly, Defendants do not have a legal or proprietary method to obtain a positive result for the Diamond Owners because, as strangers to the relationship between Diamond and the Diamond Owners, they have no lawful ability to obtain a cancellation or termination of the purchase and finance obligations owed under the Timeshare Contracts.

27.    To make matters worse, some Diamond Owners who have issues with their timeshare product can resolve the issue by contacting Diamond or by utilizing the Diamond Transitions® program.  Transitions® is not available to all Diamond Owners, nor is it a guaranteed method to allow Diamond Owners to terminate their obligations under the Timeshare Contracts, but, other than resale, foreclosure or another separate agreement with Diamond, it is the only legal method for a Diamond Owner to terminate his or her relationship with Diamond.

28. Defendants, acting both separately and in concert (as further detailed hereinbelow), have engaged in various scams to take advantage of Diamond Owners and cause damage to Plaintiffs' sales and reputations. Each Defendant plays a specific role necessary to effectuate and complete the scams. Together, Defendants purposefully act, using shell companies and websites, as well as lawyers and sham law firms (sometimes controlled by nonlawyers) improperly related to non-lawyer "marketing" firms, to divert, or to otherwise hide and abscond with, funds from Diamond Owners (diverting those funds from payment of lawful obligations to Diamond), and interfere with the current and prospective contractual relationships between Diamond Owners and Diamond. A diagram identifying Defendants' affiliations and interactions is attached hereto as **Exhibit "A."**

29. Defendants are not parties to the Timeshare Contracts. Yet, they falsely advertise a "cancellation," "exit," or "transfer" service wherein they can "legally" release or "exit" Diamond Owners from the obligations of their Timeshare Contracts. Such advertisements are false because Defendants have no such method or ability. The following is an example advertisement by the USCA Defendants from one of their websites:

⊟ What is the timeshare rescission service?

The timeshare termination service is the process of legally cancelling your resort membership and eliminating all the annual maintenance expenses as well. This process enables the timeshare disposal so owners are completely free from their timeshare resort ownership – permanently. Clients will be assigned a timeshare attorney who will assist in the timeshare termination process or timeshare rescission of agreement is completed.

As set forth in greater detail in this Third Amended Complaint, the USCA Defendants do not possess a "legal process" of "permanently" terminating a Diamond Owner's Timeshare Contract, and this advertisement is therefore false and misleading.

30. The following is a representative advertisement utilized by the Newton Defendants in a mass mailer sent to timeshare owners, including the Diamond Owners:

> We are attempting to contact you because our records suggest that you are an owner who may be affected by new Timeshare Laws allowing developers to raise maintenance fees with no restriction. These new laws may also make it more difficult for owners such as yourself to get rid of your timeshare.
>
> Let us help.

A copy of this letter (the "**Newton Defendant Letter**") is attached hereto as **Exhibit "B."** However, there is no such law; this advertisement (and its implication that maintenance fees will increase dramatically and without restriction) is completely false and misleading.

31.     The USCA Defendants collectively engage in the advertising attributed to them in this Third Amended Complaint.  The Newton Defendants collectively engage in the advertising attributed to them in this Third Amended Complaint.  Even if DC Capital does not engage in any readily apparent advertising, it knowingly accepts the benefits of the false or misleading advertising engaged in by the Newton Defendants and, potentially, other third-parties.

32.     This Third Amended Complaint requests declaratory and injunctive relief for false advertising and contributory false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) and under the causes of action for a defendant making false and/or misleading representations about its own goods or services, intentional interference with contractual relations, civil conspiracy, and violations of the Florida Deceptive and Unfair Trade Practices Act ("**FDUPTA**").

<u>**The USCA Defendants**</u>

33.     USCA purports to be a law firm that "represents" clients that are referred to it by marketing companies, such as Pluto and 1 Planet.  However, prior to Sussman's death, USCA was managed and/or controlled by Sussman, a non-lawyer.  USCA shares office space with Pluto and 1 Planet, which are non-law-firm entities that advertise on behalf of USCA and that refer clients to USCA.  Pluto, 1 Planet and USCA engage in an improper fee sharing arrangement, whereby

USCA pays referral fees to the non-lawyer marketing entities and the funds of "clients" are improperly commingled.

34.     Pluto, under the direction and control of Sussman, registered and/or used numerous domain names, which it has utilized in its various false and misleading advertisements and scheme to tortiously interfere with the relationship between Plaintiffs and the Diamond Owners, including:

   a.   timesharefighter.com

   b.   tsrsonline.com

   c.   bestresortrentalandsale.com

   d.   dumpyourtimesharenow.com

   e.   timesharefighter.com

   f.   timeshareresalesource.com

   g.   uscalaw.com

As an example, Pluto uses these various websites to redirect web traffic to the "www.usconsumerattorneys.com" (the **USCA Website**), which, as alleged below, contains a bevy of false and misleading advertising.

35.     1 Planet is a marketing company that engages in nationwide false and misleading advertising activities including, *inter alia*, marketing to consumers in the state of Florida. Additionally, 1 Planet utilizes its merchant accounts to process payments on behalf of USCA for consumers who decide to use USCA's "services."  In certain instances, 1 Planet has also paid a portion of certain payments made to USCA to marketing or other companies that referred consumers to USCA.  Based upon information and belief, USCA is co-mingling client funds with 1 Planet and is improperly splitting those fees with additional other, non-lawyer entities.

36.     Sussman and Portner are both individually and personally responsible for the actions of the USCA Defendants.

37.     With respect to Portner, his individual control over the other USCA Defendants includes the following:

a. Portner is the ostensible owner and managing partner of USCA; because the USCA Defendants' scheme requires a law firm to operate, and a law firm must legally be owned and managed by an attorney admitted to the highest court of at least one state, Portner is instrumental in the USCA Defendants' scheme;

b. Portner personally made and/or consented to the decision to operate USCA out of the same office as, and to intermingle USCA with, 1 Planet;

c. Portner is personally involved in, and approves, the marketing and advertising decisions and actions undertaken by at least some of the USCA Defendants, including, without limitation, USCA; and

d. Portner is personally involved in, and directs, the day-to-day operations of USCA.

38.     With respect to Sussman, prior to his death, his individual control over the other USCA Defendants included the following:

a. Sussman held himself out as the "manager" of USCA, even utilizing the email address "uscamanager@aol.com" when recruiting employees to the USCA Defendants;

b. many of the various websites operated, owned or controlled by the USCA Defendants identify that Sussman was the person directing the marketing activities of the various USCA Defendants (including, without limitation, 1 Planet);

c. Sussman held himself out as an expert in the advertising engaged in by the USCA Defendants;

d. Sussman was (along with Portner) personally making the decisions and directing the activities of the USCA Defendants with respect to their false, deceptive, and misleading advertising and marketing;

e. Sussman was personally directing how to accept consumers into the USCA Defendants' scams and how much those consumers needed to be charged; and

f. Sussman personally directed the use of USCA merchant accounts to process consumer payments for consumers that were recruited through non-party third-party entities

39. Whether directly or indirectly through Pluto or 1 Planet, USCA uses false and misleading advertising to lure Diamond Owners into an intricate scheme that solely financially benefits the USCA Defendants. This scheme proximately causes harm to the sales and reputations of Plaintiffs and causes adverse financial consequences to the Diamond Owners in the form of (i) payments to the USCA Defendants, for which promised services are not rendered, (ii) damaged credit reporting, and (iii) foreclosures on their financial history.

40. Specifically, the USCA Defendants[2] utilize different false and misleading advertisements and techniques to lure unsuspecting Diamond Owners into the scheme, including:

a. The USCA Defendants, in violation of the Florida (amongst other) Bar Rules, offer guaranteed results to their prospective clients, which include the Diamond Owners. On the USCA Website, USCA advertises a variety of guarantees, including a guarantee

---

[2] Without the benefit of discovery, it is difficult to specifically identify which specific advertisements are attributable to the individual USCA Defendants. However, Plaintiffs are aware that the USCA Defendants own, operate or manage numerous websites, as alleged more specifically herein, and that the USCA Defendants use search engine optimization ("**SEO**") strategies that are designed to enhance their brand on the internet and direct Diamond Owners to their websites and other online marketing platforms. Plaintiffs believe that discovery will fully develop which individual USCA Defendants own, manage and operate the various websites, which are response for the SEO strategies, and which ultimately receive the financial benefit of the scheme.

that all "paid in full timeshare cancellations are guaranteed to be transferred or in

process within 12 months," a 100% satisfaction guarantee, and "100% No More Fees."

Moreover, using SEO strategies, the USCA Defendants enhance their brand and offer

"Timeshare Lawyer Cancellation 100% Guaranteed." *See* **Exhibit "C"** attached

hereto. The USCA Website also contains a video wherein USCA claims a 100%

success rate.[3]

b. Additionally, the USCA Defendants claim that they have a legal method to cancel

timeshare obligations owed by a timeshare owner. Indeed, on the USCA Defendant

Video Advertisement, the USCA Defendants claim that they "can use the legal system

to get your timeshare obligation CANCELLED directly with your timeshare

company."

c. In the USCA Defendant Video Advertisement, the USCA Defendants wrongfully claim

that "a big majority of timeshare owners today are now walking away from their

contracts," which misleads timeshare owners, including the Diamond Owners, to

believe that they need to get out of their timeshare interests because so many others are

also getting out of their timeshare interests.

---

[3] A nearly identical video can be viewed on the website "www.dumpyourtimesharenow.com" ("Dump Your Timeshare"), which is affiliated with the USCA Defendants. Specifically, the video can be found at "http://dumpyourtimesharenow.com/timeshare-cancellation-presentation.php". While Dump Your Timeshare attempts to redact all information regarding the businesses and/or lawyers affiliated with Dump Your Timeshare, it is apparent that Portner and Sussman's brother, Mitchell Sussman, who is also a timeshare exit lawyer, are affiliated with Dump Your Timeshare. Plaintiffs believe that the other USCA Defendants also operate, manage or benefit from the Dump Your Timeshare website. The video found on the USCA Website and on Dump Your Timeshare is nearly identical and they will collectively be referred to as the "**USCA Defendant Video Advertisemen**t."

d.  In the USCA Defendant Video Advertisement, the USCA Defendants also mislead timeshare owners, including the Diamond Owners, by asserting that new timeshare laws make it more difficult to get out of a timeshare interest.

e.  The USCA Defendants also claim that they are selective in the clients that they accept as part of the USCA Defendant Video Advertisement.  The USCA Defendants claim that if they are not confident about the matter, then they will not accept the money or the representation of the timeshare owner, which includes Diamond Owners.

f.  In the USCA Defendant Video Advertisement, the USCA Defendants prey on timeshare owners, including the Diamond Owners, by proclaiming that "heirs inherit the timeshares and will be responsible for *all* fees and expenses" and assert, without reservation, that children of timeshare owners are forced to take their parents' timeshare interests and all accompanying expenses.

g.  The USCA Defendants also use the USCA Defendant Video Advertisement to mislead timeshare owners, including the Diamond Owners, into believing that the USCA Defendants have a program that will allow the Diamond Owners to legally eliminate all timeshare fees forever.  The advertisement misleads timeshare owners to believe that the day they retain the USCA Defendants, the timeshare owners will no longer be obligated to pay maintenance fees, assessments of other financial obligations relating to their timeshare interests.  An image of that portion of the USCA Defendant Video Advertisement (from both websites) is seen below:




These advertisements shall be collectively referred to as the "**USCA Defendants' Website Advertisements**," and they are specific, but not exhaustive, examples of the false and misleading advertising used by the USCA Defendants.

41.     However, the USCA Defendants' Website Advertisements are false and misleading as it relates to the Diamond Owners, for the following reasons:

a.   The USCA Defendants cannot validly guarantee success and do not have a 100% success rate because there are many times when the "result" they obtain for a Diamond Owner could never be considered a success.  Such situations include when the Diamond Owner suffers severe adverse financial credit reporting against them or when a foreclosure is permanently on the Diamond Owner's financial record because the Diamond Owner – at the behest or encouragement of the USCA Defendants – defaults on his or her obligation owed under the Timeshare Contracts.  Indeed, there are many instances where a USCA Defendant is not successful in obtaining a successful result for a Diamond Owner.  For example, USCA represented a Diamond Owner in binding arbitration, but lost that arbitration badly.  Yet, upon information and belief, the USCA

- 16 -

Defendants have never returned money paid by a Diamond Owner based on a lack of success, so their alleged "money back guaranties" are hollow and meaningless.

b.  There is no legal method for a stranger to the relationship, such as a USCA Defendant, to "cancel" the timeshare interest of a Diamond Owner.  While Diamond does offer Transitions® as a program to assist some Diamond Owners in legally terminating their obligations under the Timeshare Contract, there is no such legal mechanism for a third party exit company or law firm to achieve the same result.

c.  The USCA Defendants' advertisements that a "big majority" of timeshare owners are walking away from their timeshare interests is false.  Specific to Diamond, there are approximately 480,000 Diamond Owners, and the large majority of them are happy members who are not seeking to exit their timeshare.

d.  There are no new timeshare laws that make it difficult for a Diamond Owner to lawfully exit their timeshare interest.  Any assertion to the contrary is false and misleading.

e.  The USCA Defendants are not selective in accepting clients or their money.  Rather, upon information and belief, the USCA Defendants do not routinely turn down money from timeshare owners, including Diamond Owners, nor do they have a process whereby they evaluate whether potential clients should be accepted or rejected.

f.  The USCA Defendants' advertisements that heirs of timeshare owners, including Diamond Owners, must inherit the timeshare interests and corresponding expenses are fundamentally misleading.  Rather, such grants or transfers are governed by applicable inheritance laws, which generally allow heirs to accept or reject inheritances.

g.  The USCA Defendants have no program and no proven method to get timeshare owners, including Diamond Owners, out of their timeshares.  Additionally, any

insinuation that the USCA Defendants can legally get rid of fees and costs associated with timeshare interests is false and misleading because there is no such legal method available to the USCA Defendants.

42.     In addition to the USCA Defendants' Website Advertisements, the USCA Defendants have, at varying times, also included direct references to Diamond on their various associated websites, including, without limitation, alleged evidence of the 'success' of their 'process' in 'exiting' consumers from their Diamond timeshare contracts.  USCA has not had such "success" as it relates to Diamond or Diamond Owners.

43.     In reality, the USCA Defendants make a variety of false and misleading claims in their advertisements that are designed to deceive Diamond Owners, amongst others, into wanting to terminate their Timeshare Contracts and into believing that the USCA Defendants are able to legally (and without adverse consequences) eliminate the Diamond Owners' contractual obligations to Diamond.

44.     The USCA Defendants use a variety of social media platforms and other advertising mediums to promulgate the USCA Defendants' False and Misleading Advertisements.

45.     The USCA Defendants increase the web traffic to their websites through extensive and targeted SEO strategies.  As an example, the USCA Defendants have purchased dozens of Google AdWords® incorporating Diamond's registered and unregistered intellectual property (the "**Diamond Marks**").  Those Google AdWords®, including the following:

a.   "cancel diamond resorts membership";

b.   "diamond resorts scams";

c.   "diamond resorts scam";

d.   "cancel diamond resorts timeshare";

e.   "cancel diamond resorts";

    f.   "cancel diamond timeshare";

    g.   "diamond resorts class action lawsuit";

    h.   "how to get out of diamond resorts";

    i.   "diamond resorts international problems";

    j.   "diamond resorts international complaints"; and

    k.   "how to cancel diamond resorts membership".

In addition, the USCA Defendants purchased numerous Google AdWords® that incorporate and utilize the Diamond Marks, which Google AdWords® relate to various Diamond branded properties without anything more, such as, but not limited to:

    a.   "diamond resorts arizona";

    b.   "diamond resorts branson missouri";

    c.   "diamond resorts international lake tahoe";

    d.   "daily mirror diamond resorts"; and

    e.   "diamond timeshare".

    46.    The USCA Defendants purchased the Google AdWords® to increase traffic to their various websites, which contain the USCA Defendants' False and Misleading Advertisements. The USCA Defendants purchase an extraordinary amount of Google AdWords®.  By way of comparison, there are a global total of 3,963 total Google AdWord® keywords purchased by the USCA Defendants and Diamond.  Of these 3,963 keywords, 24 are purchased by both Diamond and the USCA Defendants, Diamond purchased 437 unique keywords, and USCA purchased 3,502 unique keywords.  For the Google AdWords® where Diamond and the USCA Defendants both purchased the keywords, the derogatory ads may appear side-by-side with Diamond's advertisements, which is intentional and meant by the USCA Defendants to divert traffic from Diamond's website thereby causing damages to Diamond's business reputation and sales.

Increasing traffic to the USCA Defendants' False and Misleading Advertisements is a critical part of the USCA Defendants' improper scheme.

47. The USCA Defendants also use other, passive websites that are designed solely to squelch bad reviews regarding the USCA Defendants or otherwise make it difficult for consumers to find negative reviews or "tell alls" of the USCA Defendants and their schemes. The USCA Defendants also utilize metadata, coding, and backlinking to promote themselves. Recently, there were approximately 269 backlinks that are designed to increase the profile of the USCA Defendants.

48. In addition to the use of the various aforementioned websites, online videos, and SEO strategies, the USCA Defendants market and solicit timeshare owners through call centers, and direct marketing (such as bulk mailers) that enhance their brand, and direct Diamond Owners to their false and misleading advertising.

49. For example, 1 Planet engages in the business of telemarketing solicitations directed to timeshare owners, such as the Diamond Owners, with the intent to falsely advertise the services of the USCA Defendants and to encourage Diamond Owners to want to cancel their timeshare interests with Plaintiff. An example resume of a former employee of 1 Planet (the "**1 Planet Resume**") is attached hereto as **Exhibit "D."** In the 1 Planet Resume, the creator confirms that 1 Planet operates a call center, that the creator was an employee of the call center, that the creator offered "solutions for the cancellation of resort contracts," and the creator met "company quota and requirements … and earned reputation for exceeding sales goals." *See* Ex. D, Pgs. 1-2. The 1 Planet Resume confirms that 1 Planet's motive was to develop "highly empathetic relationships" with consumers in order to achieve lofty sales goals. *See id.* These sales goals were

- 20 -

satisfied when the false and misleading advertising of 1 Planet and the other USCA Defendants led timeshare owners, such as the Diamond Owners, to pay fees to the USCA Defendants.

50. Moreover, 1 Planet, Pluto, and/or USCA engage in direct telephone marketing to timeshare owners, including Diamond Owners, which is also known as "cold calling." An example call script used by the USCA Defendants (the "**USCA Call Script**") is attached hereto as **Exhibit "E."** The USCA Call Script is false and misleading for the following reasons:

    a. The USCA Call Script identifies that the host had been working with a 'intake manager' "for many years now" and that this individual was one of the "most respected and experienced Intake Managers," which is false and/or misleading because the script contains blank spaces for the name of the alleged intake manager and therefore the foregoing was said about any person who happened to be an intake manager;

    b. In the USCA Call Script there are advertisements regarding USCA's "Guaranteed Solution" which, as set forth in this Third Amended Complaint, is false and/or misleading because there is no such "guaranteed solution" other than foreclosure;

    c. USCA also advises that "USCA agrees to provide each Client this Service Guarantee which states; Client will receive a bona fide offer to terminate their timeshare in approximately 12 months or less (from the time the ownership documents are submitted to USCA) or Client can receive 100% of their fee back." This advertisement is false and misleading because the USCA Defendants do not have a method to ensure that the result is obtained, and, based upon information and belief, the USCA Defendants do not return fees to Diamond Owners or other timeshare owners;

    d. Pursuant to the USCA Call Script, "[t]he reason why we are so successful getting our clients out of their contract is very simple, [w]e only work on a qualified basis, meaning

we do not work with all timeshares. We only work with timeshare owners when we know we can cancel them out of their contracts," which is false and/or misleading because the USCA Defendants will take any U.S. based timeshare owner and does not qualify their clients; and

e. As with the USCA Defendant Website Advertisements, the USCA Call Script claims that the "program will eliminate all timeshare fees forever," which is false and misleading because the USCA Defendants have no legal basis to obtain such a result, and if such a result could be obtained, it is only after the timeshare owners' (such as a Diamond Owner) credit is ruined and a foreclosure is on their record.

51. The USCA Call Script also advises the timeshare owners, including Diamond Owners, that if they are "*still paying on a mortgage, your attorney will instruct you <u>on when</u> to stop making those payments. Usually, it's right away* but again every case can be a little bit different." *See* Ex. E, Pg. 13 (emphasis added). This type of advertisement is a proximate cause of damages to Plaintiffs – holders of the financing contracts – based upon false and misleading advertising of the USCA Defendants.

52. The foregoing false and misleading advertisements shall collectively be referred to as the "**USCA Defendant False and Misleading Advertisements**."

53. Unfortunately, the USCA Defendant False and Misleading Advertisements lead the Diamond Owners to pay the USCA Defendants significant upfront fees for their "services," but such services, promises and guarantees are never delivered or kept by the USCA Defendants, who immediately take the fees for themselves, often without performing any type of service for the Diamond Owner.

54.     Then, to the extent they have not done so already, once the USCA Defendants engage the Diamond Owner and take their upfront fees, they encourage or expressly advise the Diamond Owner to default on their payment obligations owed to Plaintiffs under the Timeshare Contract and disparage Diamond, thereby proximately causing damages to Plaintiffs' sales and reputations.

### The Newton Defendants and DC Capital

55.     The Newton Defendants, along with DC Capital, are a group of timeshare exit companies that are involved in an interconnected scheme to lure unsuspecting timeshare owners, such as the Diamond Owners, into paying them upfront, exorbitant fees to get the owners out of their timeshare based on false and misleading advertisements.  Gordon Newton is a partner at DC Capital and is also responsible for the operations of the Newton Defendants.

56.     The Newton Defendants bill themselves as "The #1 Trusted Timeshare Exit Company" and "The #1 Trusted Name In Timeshare Exit."  *See* http://newtongrouptransfers.com. As part of the scheme, the Newton Defendants and DC Capital convince timeshare owners, such as the Diamond Owners, that timeshare ownership is undesirable and that they should stop making the payments required under the Timeshare Contracts, which causes harm to Plaintiffs' sale and reputation and, separately, the Diamond Owners.

57.     Newton Group has at least three related companies.[4]  The first, Newton ESA, acts a marketing company (similar to 1 Planet and Pluto).  The "ESA" in Newton ESA's name stands

---

[4] As with the USCA Defendants, it is difficult to decipher, without discovery, the interactions of the companies.  For example, Newton Group and Newton ESA are so intertwined that the client "welcome letter" utilized by the Newton Defendants is signed on behalf of both Newton Group and Newton ESA.  A copy of one such "welcome letter is attached hereto as **Exhibit "F."** However, to the extent possible, Plaintiffs have separately identified the improper actions of each Newton Defendant and DC Capital herein.

for "elite sales associates."  The second, IBD, acts as an unlicensed timeshare broker.  The third,

Newton Exit, holds powers of attorney from Diamond Owners, which grants the Newton

Defendants vast authority to "transfer, terminate, cancel or otherwise divest" timeshare owners,

such as the Diamond Owners of their timeshares.  A copy of the Newton Defendants' "Power of

Attorney" form is attached hereto as **Exhibit "G."**  In the Power of Attorney, Diamond Owners,

and any other timeshare owners that sign the Power of Attorney, grant Newton Exit all "necessary"

powers to terminate the consumers' timeshare interest, which could include hiring counsel,

conveying the timeshare interest to a Viking Ship,[5] or discontinuing payments required by the

Timeshare Contracts.  *See* Ex. G.  Indeed, while the Power of Attorney outlines some of the actions

that the Newton Defendants may take once they receive the Power of Attorney, it also expressly

states that it is not intended to limit the powers granted, but is intended "to expand or enlarge upon

the same."  *See id.*

58.    While not purporting to be a law firm like USCA or DC Capital, the Newton

Defendants refer Diamond Owners to law firms that purport to be able to eliminate the owners'

contractual obligations to Diamond but, instead, improperly take referral fees, or otherwise share

fees among themselves, all while providing no real services to the owners.  The Newton

Defendants improperly refer clients to both USCA and DC Capital and improperly split fees with

each of them such that both USCA and DC Capital benefit from the Newton Defendants' false

---

[5] A "Viking Ship" is a method of transfer used by certain timeshare exit companies whereby they transfer the timeshare interest to an assetless shell company that has no ability to pay the appurtenant maintenance fees and other financial obligations associated therewith.  The timeshare developer is then forced to foreclose on the timeshare interest or allow it to continue as a non-paying timeshare interest owner.  This practice has been prohibited in various states, including in Florida.

and/or misleading advertising. The Newton Defendants each also engage in fee splitting or improper commingling of funds amongst each other as well.

59. Newton ESA utilizes phone agent cold calling, phone agent lead cultivation, voice mail marketing, form emails, fax blasting, text messaging, and direct mail techniques directed, at least in part, to Diamond Owners to distribute the false and misleading advertisements that serve as the origination for the claims alleged herein.

60. The Newton Defendant Letter is an example advertisement sent by Newton ESA or Newton Group on behalf of the Newton Defendants. *See* Ex. B. The Newton Defendant Letter is false and misleading because it claims that there are "new Timeshare Laws allowing developers to raise maintenance fees with no restriction." *See* Ex. B. However, this is patently false as there are numerous restrictions or prohibitions on any such effort by a timeshare developer, including fiduciary obligations by the various boards of directors and management companies that determine and approve maintenance fees – as opposed to timeshare developers. Rather, this type of false and misleading advertisement is designed to convince timeshare owners, including Diamond Owners, to reconsider their continued ownership of timeshares and to thereafter pay money to the Newton Defendants to get out of their timeshare.

61. The scheme continues in the Newton Defendant Letter as it states that "experts" will be in the local area and that these experts can "explain exactly how we get you out of your timeshare contract while, in some cases, recouping a portion of your investment." *See* Ex. B. This is false and misleading as the Newton Defendants have no particular expertise and neither they, nor DC Capital or USCA have a lawful method to assist timeshare owners, such as Diamond Owners, to terminate their Timeshare Contracts. Instead, this advertisement is designed solely to

mislead the consuming public, including Diamond Owners, and induce them to attend a meeting hosted by the Newton Defendants.

62.     The Newton Defendants also use letters that claim that the consumer has been "pre-qualified" to participate in the Newton Defendants' alleged exit program.  This advertisement is false and/or misleading as there is no "pre-qualification," and anyone willing to pay what the Newton Defendants demand can become a customer of the Newton Defendants.

63.     In addition to these letters, the Newton Defendants published a "Consumer's Guide to Timeshare Exit" (the "**Newton Defendant Consumer Guide**"), which can be found by filling out information identified on the Newton Defendants' websites.  For example, a consumer, such as a Diamond Owner could obtain the Newton Defendant Consumer Guide by going to "https://newtongrouptransfers.com/".  A copy of the Newton Defendant Consumer Guide is attached hereto as **Exhibit "H**."  In the Newton Defendant Consumer Guide, the Newton Defendants state that it is "dangerous" to contact the resort or timeshare developer to discuss an exit from their timeshare.  However, this statement is false or misleading as it relates to Diamond Owners as Diamond offers Transitions® to some Diamond Owners, which can allow for the termination of qualifying Diamond Owners' timeshare interests.

64.     This advertisement is demonstrative of the Newton Defendants' scheme because there have been numerous instances where Diamond Owners working through Transitions® advised that they had paid fees and were working with the Newton Defendants.  Thus, while the Newton Defendant are aware that Diamond offers a program that assists some Diamond Owners with terminating their timeshare interest, the Newton Defendants advertise that it is dangerous to contact Diamond to discuss a possible exit from the timeshare.  The only purpose for such an advertisement is to obtain financial gains for the Newton Defendants, which causes harm to

Plaintiffs' sale and reputations, and to the Diamond Owners who pay hefty fees to the Newton Defendants for services that potentially could have been accomplished by the Diamond Owner without outside assistance.

65.     Upon information and belief, the Newton Defendants purchase leads and/or client lists from third-party sources to locate prospective victims.  The Newton Defendants then engage in mass bulk mailing and telemarketing, which advertisements also include false and misleading information that is disseminated to Diamond Owners.

66.     Additionally, the Newton Defendants falsely advertise their "skin in the game guarantee" whereby the Newton Defendants state that a consumer will never pay the Newton Defendants or the timeshare company any more money because the Newton Defendants will become "financially responsible for your timeshare until it is out of your name" and that this is important because "[i]n this way, our goals are aligned.  The longer it takes us to complete the transfer process, the more it cost us in fees to the resort.  Both company and client want to see an expedient end to your timeshare ownership."  In reality, many consumers, including Diamond Owners, have gone into default on their accounts because the Newton Defendants do not assume financial responsibility for the timeshare interest and do not make required payments.  In this way, the Newton Defendants accomplish a "timeshare exit" through default and foreclosure.

67.     The Newton Defendants, on their websites, also advertise a 100% Money Back Guarantee to get timeshare owners, such as Diamond Owners, out of their timeshare and to terminate all future financial responsibilities.  As with the USCA Defendants, such a guarantee is false and misleading because the Newton Defendants, as third parties to the relationship, have no ability to terminate the existing Timeshare Contract between Diamond and Diamond Owners and

the Newton Defendants have not returned fees paid to Diamond Owners when they have been unsuccessful in meeting the guarantee.

68.     The purpose of the Newton Defendants' false and/or misleading advertisements is to trick the consuming public, including Diamond Owners, in to retaining the Newton Defendants' illusory timeshare exit services.

69.     There are two ways that the Newton Defendants attempt to get Diamond Owners out of the Timeshare Contracts.  First, the Newton Defendants sometimes attempt to get Diamond Owners out of their timeshare by using fraudulent deed transfers or quit claim deeds (or other deeds that have not been countersigned by the timeshare company) to transfer the timeshare interests from the consumers to a strawman buyer, who then defaults on payments and suffers a mass foreclosure, *i.e.*, the "Viking Ship" scheme.

70.     On other occasions, the Newton Defendants may refer a Diamond Owner to a "law firm," such as USCA or DC Capital.  The Newton Defendants advertise that:

> If you do need an attorney, Newton Group Transfers will hire you an experienced timeshare exit attorney and back your legal representation with the following Newton Group Guarantees:
>
> *Our Representation Guarantee.* Newton Group Transfers will hire an experienced timeshare exit attorney to represent you, the timeshare owner. Some companies state that they have "attorneys on staff" but those attorneys would not represent you. When we hire an attorney for you, they will represent you and your interests. You will receive a letter of representation to confirm that the attorney is in fact representing you.
>
> *Our "One Flat Fee" Guarantee.* With a timeshare exit, the number of hours involved is unknown, which could leave you exposed to outrageous legal fees if billed by the hour. Having one all-encompassing fee assures you that your attorney is aligned with your goal of ending your timeshare ownership as soon as possible. Furthermore, this will guard against any additional legal fees in the event of litigation with the resort. Keep in mind, you could still be subject to additional settlement fees from the resort.
>
> *Our 100% Money Back Guarantee.* If the attorney we hire to represent you fails to either provide an exit solution or settlement agreement, Newton Group Transfers will return ALL of your money.

71.     The "law firms," such as USCA, DC Capital, and several others, then carry on the scheme set forth in this Third Amended Complaint.  These referrals are a direct result of the false and/or misleading advertising engaged in by the Newton Defendants.  USCA and DC Capital pay

for these false and/or misleading advertising services either through direct payments and/or allowing the Newton Defendants to keep a portion (frequently a substantial portion), *i.e.*, an improper referral fee, of the fee paid to the Newton Defendants by a Diamond Owner.

72. When referring a Diamond Owner to a law firm, the Newton Defendants, in form documents (and in advertising contained on their websites) state that the attorney is being retained at "no cost" to the owner. This is false and/or misleading because, in reality, retaining the attorney is the only thing the Newton Defendants have done for the Diamond Owner. This referral is one of the reasons Newton Exit obtains the "Power of Attorney" from Diamond Owners.

73. Once referred to the law firm, the law firm furthers and assists in the fraudulent scheme by sending standard form letters on behalf of the Diamond Owner to Diamond directing that Diamond cease communicating with the Diamond Owner. Examples of such letters sent by DC Capital are attached hereto as **Composite Exhibit "I."** These letters confirm that DC Capital has no method or means to assist the Diamond Owner in exiting their Timeshare Contract; instead, they summarily state that the Diamond Owner "has exhausted all known avenue of divestiture to no avail" and then requests that the company merely retake the timeshare contract. In due course, Diamond notifies DC Capital that the requests to take back the timeshare interests are denied, yet DC Capital fails to inform the Diamond Owners of the rejected offer to take back the timeshare interest.

74. The advertisements listed The Newton Defendants and DC Capital Section of the Third Amended Complaint will be referred to as the "**Newton Defendants' False and Misleading Advertisements**."

**Defendants Do Not Provide Legitimate Services to the Diamond Owners**

75.     None of the Defendants has a "process" or "legal" basis for "cancelling" a consumer's timeshare contract.  Defendants, through USCA, Newton Group, and/or DC Law (and potentially other avenues) send form letters to Diamond with little to no follow-up.  Many of these letters are nonsensical, reference non-existent or irrelevant laws, and admit that the Diamond Owners will default on their payment obligations.  The letters admit that a default will occur because Defendants have instructed the Diamond Owners to cease making payments and, in fact, have promised the Diamond Owners that once the Diamond Owners retain Defendants the Diamond Owner) will never have to make another payment to Plaintiffs again.

76.     The USCA Defendants' False and Misleading Advertisements and the Newton Defendants' False and Misleading Advertisements (collectively the "**False and Misleading Advertisements**") are not puffery but are an intentional and malicious fraud.  Indeed, the False and Misleading Advertisements guarantee success, state that Defendants have a 100% success rate, imply that Defendants have a legal process that allows the Diamond Owners to safely exit their timeshare, claim that new timeshare laws allow developers to increase maintenance fees without restriction and that heirs of the Diamond Owners are required to take the timeshare and the appurtenant costs associated therewith – all of which are designed to convince timeshare owners, such as the Diamond Owners, to make the decision to terminate their timeshare and pay Defendants thousands of dollars for their illusory services.  No rational consumer would pay such sums of monies to a third-party when Transitions® is an option or when the Diamond Owner could to achieve the same results that Defendants can obtain (cancellation, defaults, and/or foreclosures for nonpayment) by ceasing payments.

77.     The False and Misleading Advertisements cause direct harm to Plaintiffs.  The
False and Deceptive Advertisements make false and/or deceptively misleading statements about
both Defendants' products and services and about timeshare generally, which relates to Diamond
as alleged herein.  These statements deceive consumers, including Diamond Owners, into retaining
Defendants' services, and also damage Plaintiffs.  Defendants' intention is to improperly interfere
with Diamond's contracts with the Diamond Owners.

78.     The causes of action stated below are alleged to prevent further damages to
Plaintiffs and to enjoin the illegal practices of Defendants.

### COUNT I
### Violation of the Lanham Act, 15 U.S.C. § 1125(A)(1)
(against the USCA Defendants)

79.     Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth
herein.

80.     This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) against
the USCA Defendants.  More specifically, this is an action for the USCA Defendants' False and
Misleading Advertisements regarding the USCA Defendants' own products and services.

81.     Plaintiffs are engaged in commerce within the control of Congress because they
have a cognizable commercial interest in reputation or sales and fall within the zone of interest
protected by 15 U.S.C. §1125(a).  The USCA Defendants' actions as alleged herein also constitute
commerce within the control of Congress.

82.     The USCA Defendants, through the USCA Defendants' False and Misleading
Advertisements, willfully, deliberately, and egregiously made false or misleading statements of
fact in their commercial advertisements, which were intended to, and did, mislead consumers,
including the Diamond Owners.  The USCA Defendants' False and Misleading Advertisements,
are literally false, either on their face or by necessary implication, or are materially misleading.

83.     The USCA Defendants used the USCA Defendants' False and Misleading Advertisements and the SEO strategies to directly solicit, amongst others, the Diamond Owners and potential customers of Diamond Resorts into their scheme, which financially benefits the USCA Defendants and cause damages and harm to Plaintiffs' sales and reputation by convincing Diamond Owners to stop making payments owed under the Timeshare Contracts even though such payments are required by legally enforceable contracts.  Indeed, the USCA Call Script specifically advertises that consumers, including Diamond Owners, will be instructed on when (not if) to stop making payments owed to Plaintiffs.

84.     The USCA Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public, including the Diamond Owners.  Indeed, Diamond is aware that Diamond Owners who were utilizing Transitions® had paid the USCA Defendants thousands of dollars even though they could have potentially used the program without paying the USCA Defendants a dollar.

85.     The USCA Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Diamond.  The USCA Defendants' False and Misleading Advertisements also deter Diamond Owners and prospective owners from doing business in the future with Diamond.

86.     In the event that a Diamond Owner is lured into contacting the USCA Defendants, they are then encouraged – if not directly advised – to stop making payments owed to Plaintiffs thereby causing damages to Plaintiffs' sales and reputation.

87.     The USCA Defendants' advertised services affect interstate commerce.

88.     Plaintiffs have been and continue to be injured as a result of the USCA Defendants' false and misleading statements.

- 32 -

89.     Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover and are seeking (i) their actual damages sustained as a result of the false and misleading advertising, (ii) the USCA Defendants' profits resulting from their false and misleading advertising to Diamond Owners, and (iii) the costs of the action.

90.     Pursuant to 15 U.S.C. § 1116, Plaintiffs seek an injunction upon such terms as the Court may deem reasonable, to prevent further violations by the USCA Defendants of 15 U.S.C. § 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the USCA Defendants, jointly and severally, for:

- Monetary damages compensating Plaintiffs for harm suffered by Plaintiffs, for corrective advertising, and for disgorgement of the USCA Defendants' profits, together with interest thereon;

- An award of attorneys' fees and court costs;

- Entry of injunctive relief against the USCA Defendants, as well as their agents, representatives, employees and affiliates, prohibiting the USCA Defendants from publishing false and misleading statements in their advertising, including, but not necessarily limited to, the false and misleading advertising alleged herein, on the USCA Defendants' websites or in any other electronic or print media or materials; and

- All such other relief as the Court deems just and proper.

**COUNT II**
**Violation of the Lanham Act, 15 U.S.C. § 1125(A)(1)**
(against the Newton Defendants)

91.     Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein.

- 33 -

92.     This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), against the Newton Defendants.  More specifically, this is an action based on the Newton Defendants' False and Misleading Advertisements regarding the Newton Defendants' own products and services.

93.     Plaintiffs are engaged in commerce within the control of Congress because they have a cognizable commercial interest in reputation or sales and fall within the zone of interest protected by 15 U.S.C. § 1125(a).  The Newton Defendants' actions as alleged herein also constitute commerce within the control of Congress.

94.     The Newton Defendants, through the Newton Defendants' False and Misleading Advertisements, willfully, deliberately, and egregiously make false or misleading statements of fact in their commercial advertisements, which were intended to, and did, mislead consumers, including the Diamond Owners.  The Newton Defendants' False and Misleading Advertisements, are literally false, either on their face or by necessary implication, or are materially misleading.

95.     The Newton Defendants targeted Diamond Owners by buying leads of timeshare owners, including the Diamond Owners, for unsolicited phone calls and direct mailers.  Then, the Newton Defendants used the Newton Defendants' False and Misleading Advertisements to solicit, amongst others, the Diamond Owners into their scheme, which financially benefits the Newton Defendants and cause damages and harm to Plaintiffs' sales and reputation by convincing Diamond Owners to stop making payments owed under the Timeshare Contracts even though such payments are required by legally enforceable contracts.  Indeed, the Newton Defendants' False and Misleading Advertisements mislead Diamond Owners into believing that the "exit program" allows them to ignore their financial obligations owed under the Timeshare Contracts once they retain the Newton Defendants, which is false and misleading because those financial obligations

remain due, outstanding, and are often unpaid once Diamond Owners engage with the Newton Defendants. This causes damage to Plaintiffs' sales and reputation.

96.     The Newton Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public, including the Diamond Owners. Indeed, Diamond is aware that Diamond Owners who were utilizing Transitions® had paid the Newton Defendants thousands of dollars even though they could have potentially used the program without paying the USCA Defendants a dollar.

97.     The Newton Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Diamond. The Newton Defendants' False and Misleading Advertisements also deter Diamond Owners and prospective owners from doing business in the future with Diamond.

98.     Once a Diamond Owner is lured into contacting the Newton Defendants, they are then encouraged – if not directly advised – to stop making payments owed to Plaintiffs thereby causing damages to Plaintiffs' sales and reputation.

99.     The Newton Defendants' advertised services affect interstate commerce.

100.    Plaintiffs have been and continue to be injured as a result of the Newton Defendants' false and misleading statements.

101.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover and are seeking (i) their actual damages sustained as a result of the false and misleading advertising, (ii) the Newton Defendants' profits resulting from their false and misleading advertising to Diamond Owners, and (iii) the costs of the action.

102.    Pursuant to 15 U.S.C. § 1116, Plaintiffs seek an injunction upon such terms as the Court may deem reasonable, to prevent further violations by the Newton Defendants of 15 U.S.C. § 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Newton Defendants, jointly and severally, for:

- Monetary damages compensating Plaintiffs for harm suffered by Plaintiffs, for corrective advertising, and for disgorgement of the Newton Defendants' profits, together with interest thereon;

- An award of attorneys' fees and court costs;

- Entry of injunctive relief against the Newton Defendants, as well as their agents, representatives, employees and affiliates, prohibiting the Newton Defendants from publishing false and misleading statements in their advertising, including, but not necessarily limited to, the false and misleading advertising alleged herein, on the Newton Defendants' websites or in any other electronic or print media or materials; and

- All such other relief as the Court deems just and proper.

**COUNT III**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(A)(1)**
(against USCA)

103.    Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein.

104.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

105. The USCA Defendants (except USCA) willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

106. Plaintiffs have been and continues to be injured as a result of the USCA Defendants' (except USCA) false and misleading statements.

107. USCA has contributed and continues to contribute to the other USCA Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

108. USCA explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising. Without USCA's willingness to accept those consumers as clients, the USCA Defendants (except USCA) could not advertise what they do.

109. The USCA Defendants' (except USCA) false advertisements are public, serious, and widespread, and USCA has full knowledge of such advertising and condones it.

110. More than that, USCA financially gains from the false advertisements in the form of client referrals and fee splitting with the USCA Defendants (except USCA).

111. In other words, USCA's business derives much, if not all, of its revenue from the consumers solicited through the USCA Defendants' (except USCA) false advertising.

112. Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover (i) their actual damages sustained as a result of the false advertising by the USCA Defendants (except USCA), (ii) USCA's profits resulting from the USCA Defendants' (except USCA) false advertising to Diamond Owners, and (iii) the costs of the action.

113.     Pursuant to 15 U.S.C. § 1116, Plaintiffs seek an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by USCA of 15 U.S.C. § 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against USCA for:

- Monetary damages compensating Plaintiffs for harm suffered by Plaintiffs, for corrective advertising, and for disgorgement of USCA's profits, together with interest thereon;

- An award of attorneys' fees and court costs;

- Entry of injunctive relief against USCA, as well as their agents, representatives, employees and affiliates, prohibiting USCA from publishing false and misleading statements in their advertising, including, but not necessarily limited to, the false and misleading advertising alleged herein, on USCA's websites or in any other electronic or print media or materials; and

- All such other relief as the Court deems just and proper.

### COUNT IV
### Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(A)(1)
(against the DC Capital & USCA)

114.     Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein.

115.     This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

116.     The Newton Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead

consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

117. Plaintiffs have been and continue to be injured as a result of the Newton Defendants' false and misleading statements.

118. DC Capital and USCA have contributed and continue to contribute to the Newton Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

119. DC Capital and USCA explicitly or implicitly encourage the false advertising because they accept legal representation of the consumers deceived by the false advertising. Without DC Capital and USCA's willingness to accept those consumers as clients, the Newton Defendants could not advertise what they do.

120. The Newton Defendants' false advertisements are public, serious, and widespread, and DC Capital and USCA have full knowledge of such advertising and condone it.

121. More than that, DC Capital and USCA financially gain from the false advertisements in the form of client referrals and fee splitting with the Newton Defendants.

122. DC Capital and USCA's businesses derive much, if not all, of their revenue from the consumers solicited through the Newton Defendants' false advertising.

123. Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover (i) their actual damages sustained as a result of the false advertising by the Newton Defendants, (ii) DC Capital and USCA's profits resulting from the Newton Defendants' false advertising to Diamond Owners, and (iii) the costs of the action.

124.    Pursuant to 15 U.S.C. § 1116, Plaintiffs seek an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by USCA of 15 U.S.C. § 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against USCA and DC Capital, jointly and severally, for:

- Monetary damages compensating Plaintiffs for harm suffered by Plaintiffs, for corrective advertising, and for disgorgement of USCA and DC Capital's profits, together with interest thereon;

- An award of attorneys' fees and court costs;

- Entry of injunctive relief against USCA and DC Capital, as well as their agents, representatives, employees and affiliates, prohibiting USCA and DC Capital from publishing false and misleading statements in their advertising, including, but not necessarily limited to, the false and misleading advertising alleged herein, on USCA and DC Capital's websites or in any other electronic or print media or materials; and

- All such other relief as the Court deems just and proper.

## COUNT V
## <u>Tortious Interference with Contractual Relations</u>
(against the USCA Defendants)

125.    Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein.

126.    This is a cause of action for tortious interference with existing contracts.

127.    Plaintiffs have valid and legally enforceable Timeshare Contracts with the Diamond Owners relating to the Diamond Owners' timeshare interests and the payment obligations owed thereunder.

128.     The USCA Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Plaintiffs and the Diamond Owners. The very fact that Plaintiffs have a contractual relationship with the Diamond Owners is the basis upon which the USCA Defendants sought to establish a relationship with the Diamond Owners. Indeed, if it were not for the existence of the contractual relationships between Diamond and the Diamond Owners, the USCA Defendants would have no reason to exist.

129.     The USCA Defendants: 1) solicit the Diamond Owners through USCA Defendants' False and Misleading Advertisements; 2) fraudulently induce the Diamond Owners to pay large upfront fees to the USCA Defendants instead of making their legally due and owing payments to the Plaintiffs (while providing little to no actual services of behalf of the Diamond Owners); and 3) encourage or direct the Diamond Owners to stop making payments due to Plaintiffs under the Timeshare Contracts. These actions constitute an improper and unjustifiable interference with the contractual relationship between Plaintiffs and the Diamond Owners.

130.     The USCA Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from the USCA Defendants' actions and without reasonable grounds for the USCA Defendants to believe that their actions were justified and proper.

131.     As a direct and proximate result of the USCA Defendants' intentional misconduct, Diamond Owners have terminated, defaulted, or have baselessly sought to terminate, their contractual relationships with Plaintiffs, which causes damage to Plaintiffs. Moreover, these terminations, and attempted terminations, also interfere with Plaintiffs' ability to enter into subsequent transactions with those same Diamond Owners.

132.     The USCA Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the USCA Defendants are strangers to the contractual relationships between Diamond and the Diamond Owners, and their interference with Plaintiffs' business is willful and malicious.

133.     Plaintiffs are entitled to damages against all USCA Defendants jointly and severally.

134.     The USCA Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Plaintiffs in the disruption of customer and other contractual relations; therefore, Plaintiffs do not have an adequate remedy at law.

135.     The USCA Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the USCA Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate.  Plaintiffs demand a permanent injunction be entered against the USCA Defendants and their agents, representatives, employees, and affiliates, prohibiting the USCA Defendants from contacting Diamond Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Diamond Owners.

## COUNT VI
### Tortious Interference with Contractual Relations
(against the Newton Defendants and DC Law)

136.     Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein..

137.     This is a cause of action for tortious interference with existing contracts.

138.     Plaintiffs have valid and legally enforceable Timeshare Contracts with the Diamond Owners relating to the Diamond Owners' timeshare interests and the payment obligations owed thereunder.

139.     The Newton Defendants and DC Capital have actual, constructive, and/or specific knowledge of the contractual relationships between Plaintiffs and the Diamond Owners.  The very fact that Plaintiffs have a contractual relationship with the Diamond Owners is the basis upon which the Newton Defendants and DC Capital sought to establish a relationship with the Diamond Owners.  Indeed, if it were not for the existence of the contractual relationships between Diamond and the Diamond Owners, the Newton Defendants and DC Capital would have no reason to exist.

140.     The Newton Defendants and DC Capital: 1) solicit the Diamond Owners through Newton Defendants' False and Misleading Advertisements, 2) fraudulently induce the Diamond Owners to pay large upfront fees to the Newton Defendants and/or DC Capital instead of making their legally due and owing payments to the Plaintiffs (while providing little to no actual services of behalf of the Diamond Owners), and 3) encourage or direct the Diamond Owners to stop making payments due to Plaintiffs under the Timeshare Contracts.  These actions constitute an improper and unjustifiable interference with the contractual relationship between Plaintiffs and the Diamond Owners.

141.     The Newton Defendants and DC Capital's actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from the Newton Defendants and DC Capital's actions and without reasonable grounds for the Newton Defendants and DC Capital to believe that their actions were justified and proper.

142.    As a direct and proximate result of the Newton Defendants and DC Capital's intentional misconduct, Diamond Owners have terminated, defaulted, or have baselessly sought to terminate, their contractual relationships with Plaintiffs, which causes damage to Plaintiffs. Moreover, these terminations, and attempted terminations, also interfere with Plaintiffs' ability to enter into subsequent transactions with those same Diamond Owners.

143.    The Newton Defendants and DC Capital did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the Newton Defendants and DC Capital are strangers to the contractual relationships between Plaintiffs and the Diamond Owners, and their interference with Plaintiffs' business is willful and malicious.

144.    Plaintiffs are entitled to damages against all Newton Defendants and DC Capital jointly and severally.

145.    The Newton Defendants and DC Capital's ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Plaintiffs in the disruption of customer and other contractual relations; therefore, Plaintiffs do not have an adequate remedy at law.

146.    The Newton Defendants and DC Capital's conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Newton Defendants and DC Capital, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate.  Plaintiffs demand a permanent injunction be entered against the Newton Defendants and DC Capital and their agents, representatives, employees, and affiliates, prohibiting the Newton Defendants and DC Capital

from contacting Diamond Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Diamond Owners.

**COUNT VII**
**Civil Conspiracy**
(against all Defendants)

147.    Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein.

148.    This is a cause of action for civil conspiracy to interfere with existing and future contractual relations and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

149.    Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

150.    Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' contractual relations with the Diamond Owners and collectively causing them to breach their Timeshare Contracts with Plaintiffs.

151.    Each Defendant committed or engaged in an overt act in furtherance of their unlawful conspiracy to interfere with Plaintiffs' contractual relations or to induce Plaintiffs' customers to breach their Timeshare Contracts.

152.    Defendants conspired to interfere with Plaintiffs' contractual relationships with the Diamond Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Diamond Owners.

153.     As a direct and proximate result of Defendants' civil conspiracy, Diamond Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs.

154.     Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts.  As a direct and proximate result of the foregoing actions, Plaintiffs suffered damages.

155.     Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Diamond and its business millions of dollars in actual damages.

156.     Defendants are jointly and severally liable to Plaintiffs for damages.

157.     Defendants maliciously and purposefully act, using shell companies and numerous websites, as well as lawyers who only advertise other fields of legal practice, to hide their misconduct, and to divert and abscond with funds from Diamond Owners and interfere with the contractual relationships between Diamond Owners and Diamond.

158.     Defendants acted willfully and with malice in taking these actions.

159.     Defendants' conduct therefore entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT VIII
### Violations of Florida's Deceptive and Unfair Trade Practices Act
(against all Defendants)

160.     Plaintiffs adopt and reallege Paragraphs 1 through 78 above as if fully set forth herein.

161.    This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

162.    Plaintiffs are legitimate business enterprises under the Florida Deceptive and Unfair Trade Practices Act ("**FDUTPA**").

163.    Diamond Owners are consumers for purposes of FDUTPA.

164.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

165.    Defendants are engaged in deceptive and unfair practices, including luring Diamond Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Diamond Owners to pay substantial fees to "cancel" their contracts with Plaintiffs, when, in many instances, a lawful termination is only available to consumers directly from Plaintiffs.

166.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Diamond Vacation Resorts, Inc. v. Timeshare Direct, Inc*., 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

167.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2), Fla. Stat. *Id*.; *see also Kinger v. Weekly World News, Inc*., 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

168.    Plaintiffs are parties aggrieved by Defendants' violation of FDUTPA, Section 501.204(1), Fla. Stat.

169.    As a result of Defendants' actions, Plaintiffs have suffered financial loss.

170. Plaintiffs' losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

171. Plaintiffs are entitled to recover their attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter injunctive relief against all Defendants, award Plaintiffs their costs, including their reasonable attorney's fees, and for such other and further relief as the Court deems appropriate.


Dated: July 31, 2019.

*s/Brandon T. Crossland*
Brandon T. Crossland
Florida Bar No. 0021542
Julie Singer Brady
Florida Bar No. 0389315
Catherine E. Woltering
*Admitted Pro Hac Vice*
BAKER & HOSTETLER LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, Florida 32801
Telephone: 407-649-4000
Telecopier: 407-841-0168
Email: bcrossland@bakerlaw.com
jsingerbrady@bakerlaw.com
cwoltering@bakerlaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 31, 2019, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to

all counsel of record.

*s/Brandon T. Crossland*
Brandon T. Crossland

4829-0823-9516.1

# Exhibit C



Cynthia Stoddard Hulce, Esq.
Sr. Professional Liability Claim Consultant
616.206.2963
chulce@hanover.com


Via Electronic Mail

March 11, 2019

Ms Nadine Chabrier
DC Law
700 12th Street NW, Suite 700
Washington DC 2005

### *DENIAL OF COVERAGE*


Re:   Notice of Claim:          01/09/2019
      Claimant:                 Diamond Resorts, et al
      Hanover File:             19-00366988
      Hanover Policy:           LHY-D795443-00
      Policy Effective Date:    1/28/2018   1/28/2019

Dear Mr. Chabrier:

This letter acknowledges receipt of the lawsuit entitled, *Diamond Resorts, et al v DC Law, et al. USDC SD Florida, 9:18-cv-80311.* The lawsuit is contained within the second amended complaint filed by Diamond Resorts, et al on November 30, 2018. The lawsuit was served on your registered agent on December 19, 2018.

You are insured by Hanover Insurance Company under a Lawyers Professional Liability Insurance Policy LHY D 795443 00 with effective dates December 21, 2018   December 21, 2019 and provides limits of $1,000,000 and a deductible of $1,000.00 per claim. The retroactive date is December 21, 2017.

I regret to inform you that there is no coverage available to you or the Firm for the lawsuit filed prior to and served prior to your effective date of coverage. The claim was first made prior to the effective date of your policy, it was reported during the policy period; however, a claim must be both first made and reported during the effective policy period. Accordingly, there is no coverage available for either a defense or indemnification of the claims made in the lawsuit referenced above.

The policy provides the following notice:

**NOTICE: THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR ANY APPLICABLE**

**EXTENDED REPORTING PERIOD.   THE LIMITS OF LIABILITY CAN BE COMPLETELY EXHAUSTED BY DEFENSE EXPENSES AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE DEDUCTIBLE.   THE INSURER WILL HAVE NO LIABILITY FOR DEFENSE EXPENSES OR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY**.

As detailed below, the claim was first made before the inception date of your policy.

Your policy provides the following insuring agreement:

**I. INSURING AGREEMENTS**
A.1.    **Professional Services** Liability

The **Insurer** will pay on behalf of the **Insured**, Loss which the **Insured** is legally obligated to pay due to a **Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, arising from a **Wrongful Act** in the rendering or failure to render **Professional Services**, provided that:

> 1. The **Wrongful Act** must have first occurred on or after the applicable Retroactive Date(s);
> 2. The **Insured** had no knowledge of the **Claim** or facts which could have reasonably caused such **Insured** to foresee the **Claim**, prior to the effective date of this Policy; and
> 3. The **Claim** or **Potential Claim** is reported to the **Insurer** pursuant to Section X. Reporting.

Your policy further defines claim as:

**Claim** means any:

> A. Oral or written demand received by an Insured for monetary or non-monetary relief including injunctive relief;
> ***B. Civil proceeding commenced by the service of a complaint or similar pleading;***
> C. Formal administrative or regulatory proceeding commenced by the filing of charges, formal investigative order or similar document;
> D. Arbitration or mediation proceeding commenced by the receipt of a demand for arbitration or mediation or similar document; or
> E. Written request first received by an Insured to toll or waive a statute of limitations relating to a potential Claim described in A. through D. above; Against an Insured for a Wrongful Act, including any appeal therefrom. [emphasis added]

The lawsuit was filed on November 30, 2018 and served on your authorized agent on December 19, 2018; accordingly, and pursuant to the terms of your insuring agreement, there is no coverage available for this matter.  A "claim" means any civil proceeding commenced by the service of a complaint, which in fact occurred prior to the effective date of this policy.

As noted, Hanover will not be providing coverage for the Claim under the Policy.  This also means that Hanover will not be providing a defense to you for the Claim under the Policy.  Hanover reserves the right to modify its determination concerning this Claim for coverage under the Policy if we are subsequently provided information warranting any modification.  All future communication of Hanover is subject to this full reservation of rights under the Policy and applicable law.



Cynthia Stoddard Hulce, Esq.
Sr. Professional Liability Claim Consultant
616.206.2963
chulce@hanover.com

If you believe that there are additional facts that would be material to our analysis, please provide the additional written information or documentation to us within seven (7) business days.

Thank you for reporting this matter.


*/s/ Cynthia Stoddard Hulce*
Cynthia Stoddard Hulce
Sr. Professional Liability Claim Consultant



Fraud Warning Statement for all States (except as individually listed below):
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance
containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material
thereto commits a fraudulent insurance act, which is a crime and subjects that person to criminal and civil penalties (In Oregon, theaforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). (InNew York, the civil penalty is not to exceed five thousand dollars ($5,000) and the stated value of the claim for each such violation). (Notapplicable in AL, AR, AZ, CA, CO, DC, FL, KS, LA, ME, MD, MN, NM, OK, PR, RI, TN, VA, VT, WA and WV).
APPLICABLE IN AL, AR, DC, LA, MD, NM, RI, TX (Workers' Compensation Only), and WV: Any person who knowingly (or willfully in MD) presents  false or fraudulent claim for payment of a loss or benefit or who knowingly (or willfully in MD) presents false information in an application for insurance is guilty of a crime and may be subject to fines or confinement in prison.
APPLICABLE IN ARIZONA: For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.
APPLICABLE IN CALIFORNIA: For your protection California law requires the following to appear on this form or other explanatory words of similar meaning: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.
APPLICABLE IN COLORADO: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or
claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the department of regulatory agencies.
APPLICABLE IN DELAWARE, FLORIDA and OKLAHOMA: Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing

any false, incomplete, or misleading information is guilty of a felony (In FL, a person is guilty of a felony of the third degree).

APPLICABLE IN KANSAS: Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

APPLICABLE IN MAINE, TENNESSEE, VIRGINIA, WASHINGTON AND NORTH CAROLINA: It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

APPLICABLE IN INDIANA: A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

APPLICABLE IN KENTUCKY: Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

APPLICABLE IN NEW HAMPSHIRE: Any person who with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

APPLICABLE IN MINNESOTA: A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime. MN Workers' Compensation Only: Any person who with intent to defraud, receives workers compensation benefits to which the person is not entitled by knowingly misrepresenting, misstating, or failing to disclose any material fact is guilty of theft and shall be sentenced pursuant to s 609.52, subdivision 3.

PENNSYLVANIA Motor Vehicle Only: Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

    **I.    CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>   JUDICIAL CIRCUIT, IN AND FOR <u>PALM BEACH</u>   COUNTY, FLORIDA

<u>DC CAPITAL LAW FIRM LLP</u>
Plaintiff

Case # _____

Judge _____

vs.

<u>THE HANOVER INSURANCE COMPANY</u>
Defendant

    **II.    AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

    **III.    TYPE OF CASE**    (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐ Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☐ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☐ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☐ Libel/Slander
      ☐ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
      ☐ Residential Evictions
      ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

   **IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

   **V.**    **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  I

   **VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
      ☐ yes
      ☒ no

   **VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
      ☒ no
      ☐ yes If "yes," list all related cases by name, case number, and court.
      NA

   **VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
      ☒ yes
      ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Robert C. Hubbard        Fla. Bar # 98996
         Attorney or party         (Bar # if attorney)

Robert C. Hubbard         03/10/2022
  (type or print name)         Date